COMMONWEALTH *vs.* RUSSELL HUNTLEY & another.
BENJAMIN A. PLUMLEY'S CASE.

Suffolk.   November 24, 25, 1891. — May 7, 1892.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP,
& BARKER, JJ.

*Hearing Cases together — Statute — Repeal — Constitutional Law.*

Upon a writ of habeas corpus, the court will not ordinarily consider questions
arising in a criminal case which might be brought up by a bill of exceptions;
but under special circumstances such questions were entertained, the court say-
ing that, with reference to the mode of procedure, the case was not to be deemed
a precedent for future cases.

The St. of 1891, c. 58, which makes a distinction between oleomargarine which is
an imitation of yellow butter and that which is not, and which statute is directed
only towards oleomargarine of the former class, is not repealed by the St. of
1891, c. 412, § 1, which is directed to the distinct fraud of selling or offering to
persons calling for butter something besides butter.

The fact that two statutes, similar in their nature and purpose, were both passed
at the same session of the Legislature, and took effect on the same day, is strong
evidence that they were intended to stand together.

The enactment of a statute which forbids the manufacture and sale of oleomarga-
rine which is made in imitation of yellow butter is a valid exercise of the police
power which remains in the several States, though such oleomargarine has been
imported from another State; and it is not in violation of the constitutional
provision giving to Congress the power to regulate commerce among the several
States. KNOWLTON & LATHROP, JJ., dissenting.

THE FIRST CASE was a complaint to the Municipal Court of
Boston, alleging that the defendants exposed for sale oleomar-
garine contrary to the provisions of the St. of 1891, c. 58.    Trial
in the Superior Court, on appeal, before *Sherman*, J., who, after
a verdict for the Commonwealth, reported the case for the de-
termination of this court.

The second case was a petition for a writ of habeas corpus,
after the petitioner had been convicted in the Municipal Court
of Boston of a sale of oleomargarine, had been sentenced to pay
a fine and to stand committed until the sentence had been per-
formed, and had been imprisoned accordingly.    Hearing before
*Holmes*, J., who reported the case to this court on the petition,
agreed facts, and offer of proof.

The cases were argued at the bar in November, 1891, before
*Allen, Knowlton, Morton, & Lathrop,* JJ., and afterwards, in·
February, 1892, were submitted on the briefs to all the judges.
The facts appear in the opinion.

*E. B. Powers & H. M. Ayars,* for Huntley and Plumley.

*A. E. Pillsbury,* Attorney General, (*G. C. Travis,* First Assistant Attorney General, with him,) for the Commonwealth.

ALLEN, J.   These cases arise under St. 1891, c. 58, entitled, "An Act to prevent deception in the manufacture and sale of imitation butter."

In the first case, the defendants were convicted in the Superior Court of making a sale of oleomargarine at retail, not in the original unbroken package in which it was brought into this State; and the justice who presided at the trial reported the case to this court.

In the second case, the petitioner was convicted in the Municipal Court of Boston of making a sale of oleomargarine, and was sentenced to pay a fine, and to stand committed until the sentence should be performed, and he was imprisoned accordingly, and upon his petition a writ of habeas corpus was issued, which was heard by a justice of this court, and, it being desired on both sides to present the question of the constitutionality of the statute in this mode, an agreed statement of facts was filed, by which it appeared that the sale by the petitioner was of oleomargarine in the original package.

In both cases, the constitutionality of the statute has now been argued, and in the second case there is the further question whether a writ of habeas corpus is a proper remedy for the petitioner, or whether he should be left to his appeal to the Superior Court, and to exceptions or writ of error, according to the regular course of procedure in criminal cases.

At the argument, the Attorney General, while suggesting that the questions arising in the second case ought regularly to be raised in some other way than upon a writ of habeas corpus, nevertheless, for certain special reasons, finally united with the counsel for the petitioner in the request that the questions presented should be considered and determined.  With the assent of the court, the case was accordingly argued in full upon the merits; and although this mode of raising questions in criminal cases is open to some objections, the power of the court to hear and determine questions involving the constitutionality of a statute is established.  *Herrick* v. *Smith,* 1 Gray, 1, 49.  *Sennott's case,* 146 Mass. 489.  *Ex parte Siebold,* 100 U. S. 371.  *In re Coy,* 127 U. S. 731.  *Nielsen, petitioner,* 131 U. S. 176.  *People*

v. *Liscomb*, 60 N. Y. 559.   See also *Feeley's case*, 12 Cush. 598;
*Conlon's case*, 148 Mass. 168, 172.

If the St. of 1891, c. 58, is not repealed, and if it is constitu-
tional in regard to oleomargarine of domestic manufacture and
oleomargarine brought here from other States not sold in the
original packages, some of the justices who concur in the view
here taken are of opinion that the constitutionality of the stat-
ute, so far as oleomargarine brought here from other States and
sold in original packages is concerned, cannot be decided in these
cases; but a majority of all the justices think the question may
properly be considered.    We have accordingly considered the
case upon the merits of the question, but wish to say that, with
reference to the mode of procedure, it is not to be deemed a pre-
cedent for future cases.

The first question raised on the merits is, whether the prohi-
bition against selling articles in imitation of yellow butter con-
tained in St. 1891, c. 58, is repealed by St. 1891, c. 412, which,
among other things, punishes fraudulent sales of oleomargarine
and other similar substances, and, as is contended, impliedly per-
mits such sales if made without fraud.

Repeals by implication are not favored, and both statutes must
stand unless it plainly appears that the later was intended to be
a complete substitute for the earlier one.

By various statutes passed before the year 1891, provisions
were made for marks upon oleomargarine and the packages in
which it might be contained, with a view to inform purchas-
ers of the character of the article offered for sale.    Pub. Sts.
c. 56, §§ 17, 19.    St. 1884, c. 310.    St. 1886, c. 317.    If these
various requirements were observed, oleomargarine might be
sold.

Then came St. 1891, c. 58, wholly prohibiting under a pen-
alty the manufacture or sale, or offering or exposing for sale,
or having in possession with intent to sell, any article of that
description " which shall be in imitation of yellow butter, pro-
duced from pure, unadulterated milk or cream of the same,"
with a distinct proviso that " nothing in this act shall be con-
strued to prohibit the manufacture or sale of oleomargarine in
a separate and distinct form, and in such manner a will ad-
vise the consumer of its real character, free from coloration or
ingredient that causes it to look like butter."    This act was

directed solely to products made in imitation of yellow butter. All oleomargarine not made in imitation of yellow butter stood as before.

Then came St. 1891, c. 412, which is the act relied on as repealing the former. By § 1, " Whoever sells or offers for sale, to any person who asks, sends, or inquires for butter, any oleomargarine, butterine, or any substance made in imitation of or semblance of pure butter, not made entirely from the milk of cows, with or without coloring matter, shall be declared guilty of fraud and punished by a fine," etc. That is to say, if any oleomargarine or butterine whatever, whether made in imitation of yellow butter or not, is sold or offered for sale to any person who calls for butter, the act is punishable. By c. 58, a distinction between oleomargarine which is in imitation of yellow butter, and that which is not, is clearly indicated, and that statute is directed only towards oleomargarine of the former class. By c. 412, § 1, the act of selling or offering for sale oleomargarine of either class to those who call for butter is made punishable. The act of selling or offering for sale oleomargarine made in imitation of yellow butter to one calling for butter would be punishable under c. 58, and it was unnecessary to make the later statute broad enough to include that offence. But c. 412, § 1, had a different scope and purpose, and was directed to the distinct fraud of selling or offering to persons calling for butter something else besides butter. Subsequent sections in c. 412 contain new enactments concerning the marks by which oleomargarine and other similar products are to be distinguished, and these may all well stand with the provisions of c. 58.

It is moreover to be borne in mind that these two statutes were both passed at the same session of the Legislature, and took effect on the same day. This is strong evidence that they were intended to stand together.

We are of opinion that c. 58 was not repealed by c. 412. It is not contended that St. 1891, c. 58, is in violation of the Constitution of Massachusetts, but it is urged that it is in violation of the Constitution of the United States. It was agreed that the petitioner sold an article the sale of which was forbidden by this statute; that oleomargarine has naturally a light yellowish color; and that the article sold by the petitioner was artificially colored in imitation of yellow butter. We are to assume that the

oleomargarine sold by the petitioner was wholesome, palatable, and nutritious.

In respect to intoxicating liquors, it was held in *Peirce* v. *New Hampshire, License Cases,* 5 How. 504, that a law of New Hampshire, the effect of which was to prohibit the sale, without license, of a barrel of gin purchased by the defendant in Massachusetts and by him imported into New Hampshire, was not repugnant to the Constitution or laws of the United States.   In this Commonwealth, until the recent case of *Leisy* v. *Hardin,* 135 U. S. 100, this decision has been considered as still in force; *Carleton* v. *Rugg,* 149 Mass. 550; *Blair* v. *Forehand,* 100 Mass. 136, 140; *Commonwealth* v. *Holbrook,* 10 Allen, 200; and only liquors imported from foreign countries have been considered to be outside of the scope of State legislation, Congress having acted only in respect to such.   Sts. of 1852, c. 322, § 14; 1869, c. 415, § 27.   Pub. Sts. c. 100, § 4.   *Commonwealth* v. *Kimball,* 24 Pick. 359.   *Fisher* v. *McGirr,* 1 Gray, 1, 31, 47.   *Richards* v. *Woodward,* 113 Mass. 285.

*Peirce* v. *New Hampshire* is, however, overruled by *Leisy* v. *Hardin,* the majority of the court holding that its authority, in so far as it rests on the view that the law of New Hampshire was valid because Congress had made no regulation on the subject, must be regarded as having been distinctly overthrown by numerous cases.   135 U. S. 100, 118.   A minority of the court, consisting of Justices Gray, Harlan, and Brewer, came to another conclusion, and, after an elaborate examination of the various cases, say that this review appears to them to demonstrate that that decision, while often referred to, has never been overruled or its authority impugned.   135 U. S. 158.   The later decision of *O'Neil* v. *Vermont,* 144 U. S. 323, does not modify the doctrine declared in *Leisy* v. *Hardin.*

Accepting without discussion the decision of the majority of the court in *Leisy* v. *Hardin* as settling the law for whatever it covers, we have to consider whether it extends so far as to cut off the power of the Legislature to forbid the manufacture and sale of oleomargarine which is made in imitation of yellow butter, when such oleomargarine has been imported from another State.   We wish and are bound to conform to that decision and to adopt the change which it has made in the law as heretofore understood in this Commonwealth, to the extent that the decis-

ion goes, either in express terms or by necessary implication. If, however, any further step is to be taken in that direction, it is better that it should be done by the tribunal which can declare and settle the law for all the States alike, than for us to make a decision not sanctioned by our own convictions, and perhaps not required by the views of constitutional rights and obligations entertained by the tribunal of last resort.

In cases where the constitutional provision that Congress shall have power to regulate commerce with foreign nations and among the several States has not been involved or considered, legislation of the character of St. 1891, c. 58, is supported, not only by the custom of this Commonwealth and by previous decisions of this court, but by a great weight of authority elsewhere. The statutes and decisions in relation to the sale of milk to which water has been added, and of milk below a certain standard of quality, furnish the most obvious examples arising in this Commonwealth, showing that the legislation has rested and been vindicated, partly on the ground of promoting the health of the community, but more especially on the ground of protecting the public from fraud. Pub. Sts. c. 57, § 5. St. 1886, c. 318, § 2. *Commonwealth* v. *Waite,* 11 Allen, 264. *Commonwealth* v. *Farren,* 9 Allen, 489. *Commonwealth* v. *Evans,* 132 Mass. 11. *Commonwealth* v. *Holt,* 146 Mass. 38. *Commonwealth* v. *Schaffner,* 146 Mass. 512. *Commonwealth* v. *Wetherbee,* 153 Mass. 159. *State* v. *Campbell,* 64 N. H. 402. *State* v. *Smyth,* 14 R. I. 100. *People* v. *West,* 106 N. Y. 293. See also the statutes relating to vinegar; Sts. 1884, c. 307, 1885, c. 150; to adulterated drugs and food; St. 1882, c. 263, § 1; and wholly prohibiting the sale of jewelry, feathers, and certain other articles by pedlers; Pub. Sts. c. 68, § 3.

In New Hampshire, Missouri, Minnesota, New York, New Jersey, and Pennsylvania, statutes prohibiting the sale of oleomargarine made in imitation of butter have been upheld by the courts as valid. *State* v. *Marshall,* 64 N. H. 549. *State* v. *Addington,* 77 Mo. 110; 12 Mo. App. 214. *Butler* v. *Chambers,* 36 Minn. 69. *People* v. *Arensberg,* 105 N. Y. 123. *State* v. *Newton,* 21 Vroom, 534. *Powell* v. *Commonwealth,* 114 Penn. St. 265. In *People* v. *Arensberg,* the decision rested expressly upon the distinction between oleomargarine made in imitation

or semblance of butter, and other oleomargarine which was not intended to be passed off for butter. In *Powell* v. *Commonwealth*, 114 Penn. St. 265, 295, 296, the court, by Mr. Justice Sterrett, adopting the language of Mr. Justice Thompson in *State* v. *Addington*, 12 Mo. App. 214, 223, say : " If an article of food is of such a character that few persons will eat it knowing its real character; if, at the same time, it is of such a nature that it can be imposed upon the public as an article of food which is in common use, and against which there is no prejudice; and if, in addition to this, there is probable ground for believing that the only way to prevent the public from being defrauded into the purchasing of the counterfeit article for the genuine is to prohibit altogether the manufacture and sale of the former, — then we think such a prohibition may stand as a reasonable police regulation, although the article prohibited is in fact innocuous, and although its production might be found beneficial to the public, if in buying it they could distinguish it from the production of which it is the imitation." This case was carried by writ of error to the Supreme Court of the United States, and the judgment of the State court was affirmed. *Powell* v. *Pennsylvania*, 127 U. S. 678. See also *Patterson* v. *Kentucky*, 97 U. S. 501; *Mugler* v. *Kansas*, 123 U. S. 623, 663.

The only question, therefore, respecting which there is occasion to doubt, is that arising under the provision giving to Congress power to regulate commerce among the several States. It is always conceded that States may pass laws to prevent the introduction within their limits of certain kinds of articles. No full and final enumeration has been made or attempted of the articles which thus remain subject to the exercise of the police power. In *Rahrer's case*, 140 U. S. 545, 557, the court quote with approval the language of Mr. Justice Catron, in 5 How. 600 : " If, from its nature, it does not belong to commerce, or if its condition, from putrescence or other cause, is such when it is about to enter the State that it no longer belongs to commerce, . . . then the State power may exclude its introduction." And again, " That which does not belong to commerce is within the jurisdiction of the police power of the State." In *Bowman* v. *Chicago & Northwestern Railway*, 125 U. S. 465, 489, the court say : " Doubtless the States have power to provide by law suitable measures to prevent the introduction into the States of

articles of trade, which, on account of their existing condition, would bring in and spread disease, pestilence, and death, such as rags or other substances infected with the germs of yellow fever or the virus of smallpox, or cattle or meat or other provisions that are diseased or decayed, or otherwise, from their condition and quality, unfit for human use or consumption. Such articles are not merchantable; they are not legitimate subjects of trade and commerce." The right to exclude convicts, paupers, idiots, and lunatics, and persons likely to become a public charge, as well as persons afflicted by contagious or infectious diseases, was also fully recognized (p. 492, and cases cited). These doctrines are also stated in *Leisy* v. *Hardin*, where it is declared that "the power to regulate commerce among the States is a unit, but if particular subjects within its operation do not require the application of a general or uniform system, the States may legislate in regard to them with a view to local needs and circumstances, until Congress otherwise directs." 135 U. S. 100, 108. And again, "Where the subject matter requires a uniform system as between the States, the power controlling it is vested exclusively in Congress, and cannot be encroached upon by the States; but where, in relation to the subject matter, different rules may be suitable for different localities, the States may exercise powers which, though they may be said to partake of the nature of the power granted to the general government, are strictly not such, but are simply local powers, which have full operation until or unless circumscribed by the action of Congress in effectuation of the general power." 135 U. S. 108, 109, citing *Cooley* v. *Port Wardens of Philadelphia*, 12 How. 299.

The difficulty of drawing a clear line of distinction between articles which from their nature the Legislature of a State may exclude as injurious to health or morals, and those which must be deemed to be proper objects of commerce, is obvious. Nor is it more easy to define with exactness what subjects should be considered so far local that statutes in respect to them may properly be passed by a State, though incidentally affecting commerce among the several States, until Congress provides otherwise. But all we have to deal with at present is the particular question now before us. The Legislature, while allow-

ing the sale of oleomargarine in such form as will indicate its real character to the consumer, has determined that its manufacture and sale, when it is made in imitation of yellow butter, is so productive of deception and fraud as to call for a prohibition of such manufacture and sale. This mischief has been found to exist here. It may or it may not exist in equal force elsewhere. The action of the Legislature must be presumed to have been taken upon full investigation and upon reasonable grounds. This presumption in favor of substantially similar legislation of another State is thus expressed by the Supreme Court of the United States: "The Legislature of Pennsylvania, upon the fullest investigation, as we must conclusively presume, and upon reasonable grounds, as must be assumed from the record, has determined that the prohibition of the sale, or offering for sale, or having in possession to sell, for purposes of food, of any article manufactured out of oleaginous substances or compounds other than those produced from unadulterated milk or cream from unadulterated milk, to take the place of butter produced from unadulterated milk or cream from unadulterated milk, will promote the public health, and prevent frauds in the sale of such articles." *Powell* v. *Pennsylvania*, 127 U. S. 678, 686. See also *Patterson* v. *Kentucky*, 97 U. S. 501, 504. By the statute, oleomargarine which is not deceptive in its character may be sold under certain regulations. Oleomargarine which is deceptive, and which is designed and is likely to be passed off for something different from what it really is, must not be made or sold within the State. This prohibition is applicable to residents and non-residents alike. The question is, May a State protect itself against articles so prepared as to deceive the public? No such question as this arose or was discussed in *Leisy* v. *Hardin*. Accepting the decision in that case as settling the law for intoxicating liquors of genuine quality, which are what they purport to be, and for tobacco, and other articles which are included in the same category of genuine products or compounds, there is a wide distinction between them and articles which are manufactured with a purpose to pass them off for something different from what they purport to be. If the statute under consideration had assumed to forbid the sale of all oleomargarine, a far different question would be presented. But

the statute is only directed to the suppression of the manufacture and sale in this Commonwealth of oleomargarine which is deceptive. If the sale of imported liquors which are genuine is protected, does that protection extend so far as to include bogus and imitation liquors so prepared as to be passed off for genuine? If the public were largely imposed upon by the sale of cigars which appeared to consist solely of tobacco, but which in reality were principally composed of something else, would a statute forbidding the manufacture and sale of such deceptive cigars be deemed to interfere with the power of Congress under the Constitution? The statute does not forbid the mere transportation even of deceptive oleomargarine. It may be carried through this State, or may be brought here for purposes of temporary storage, or for the consumption of the importer. What is forbidden is the manufacture or sale. The effect of the statute upon commerce among the States is only indirect and incidental. *Sherlock* v. *Alling*, 93 U. S. 99. *State* v. *Newton*, 21 Vroom, 534. Can it be doubted that the Legislature may provide for the seizure and destruction of lottery tickets, although in some parts of the country, as they were formerly in Massachusetts, lotteries are still sanctioned by law? Might not the State exclude a patented invention for drawing lotteries? See *Vannini* v. *Paine*, 1 Harr. 65, cited in *Patterson* v. *Kentucky*, 97 U. S. 501, 508.

There being a palpable distinction between the present case and *Leisy* v. *Hardin*, this court is at liberty to decide upon the validity of the statute involved in the present case, according to its own opinion.

In the opinion of a majority of the court, the enactment of the statute is a valid exercise of the police power which remains in the several States; and it is not in violation of the constitutional provision giving to Congress the power to regulate commerce among the several States. The latter doctrine has also been expressly held in New Jersey. *State* v. *Newton*, 21 Vroom, 534.

The case of *Minnesota* v. *Barber*, 136 U. S. 313, holds a statute to be invalid which by its necessary operation practically excluded from the markets of the State all fresh beef, veal, mutton, lamb, or pork, in whatever form and although entirely sound, healthy and fit for food, taken from animals slaughtered

in other States. Such a discrimination is held to be beyond the power of the Legislature of a State. This decision, in which all the justices concurred, rests upon different grounds from *Leisy* v. *Hardin*, which is not referred to in the judgment of the court, delivered by Mr. Justice Harlan, one of the dissenting justices in that case. *Brimmer* v. *Rebman*, 138 U. S. 78, follows *Minnesota* v. *Barber*.

In like manner, statutes forbidding the transportation of all Texas cattle, whether diseased or not, have been held unconstitutional, on the ground that they made no distinction. *Railroad Co.* v. *Husen*, 95 U. S. 465. *Kimmish* v. *Ball*, 129 U. S. 217, 221.

The St. of 1891, c. 58, does not fall within the principle of these decisions, it being limited in its operation to oleomargarine which is in the imitation of yellow butter, and therefore of a deceptive character.

The result is that in the first case the verdict of guilty is to stand ; and in the second case the prisoner must be remanded to jail.                                      *Ordered accordingly.*


KNOWLTON, J. I cannot agree with the majority of the court in their opinion that the Legislature of a State has power under the Constitution of the United States to prohibit commerce in oleomargarine.

The Constitution of the United States is the supreme law of the land. The States, by adopting it, gave up of their original powers those whose exercise would conflict with the provisions of the Constitution. Section 8 of Article 1 provides that Congress shall have the power " to regulate commerce with foreign nations, and among the several States." Individual States cannot legislate in such a way as to interfere with the exercise of this power by Congress. The original right of the several States to regulate their internal affairs, and, in the exercise of their police power, to enact laws for the protection of the public health, the preservation of the public morals, and the protection of the people from noxious trades and from frauds and crimes, not having been conferred on Congress by the Constitution, remains in the States. But it is subordinate to the paramount right of Congress to exercise the powers expressly conferred by the Con-

stitution.  The States have given up so much of their police power as would involve in its exercise interference with commerce in any article in which commerce is permitted by Congress. If the interests of commerce and the interests of the people in their domestic affairs are involved at the same time in any business, so that legislation in one interest would conflict with legislation in the other interest, the protection of these domestic interests, so far as they are connected with commerce, is left to Congress, which can legislate as it chooses in its own field.

When the Constitution was framed, the people apparently thought that Congress could be trusted to make regulations in regard to commerce which would have proper relation to the interests of the people in their domestic affairs.  When the· jurisdiction of a State comes in conflict with the national jurisdiction on a common field, one must give way, and the higher· authority must be asked to legislate properly, having due regard to the interest which is made subordinate.  So when it was understood that, under the laws then existing, none of the States could interfere with commerce in intoxicating liquors, and that the interests of the people of many of the States would be promoted by laws which might restrict that commerce, Congress was appealed to, and an act was quickly passed subjecting this kind of commerce to restrictive laws enacted by the States for the protection of the people in this respect.  Act of August 8, 1890, 26 U. S. Sts. at Large, 313.  *In re Rahrer*, 140 U. S. 545. Thus we have a harmonious system, which secures all the people of the United States from the imposition of restrictions on commerce through the narrow or selfish policy of the people of any State, and at the same time furnishes protection in reference to such matters connected with commerce as are ordinarily the subject of police regulation, by commercial laws adapted by Congress to the requirements of the people in respect to these matters.

These propositions are in substance embodied in the recent decisions of the Supreme Court of the United States.  In the case of *Leisy* v. *Hardin*, 135 U. S. 100, in which a statute of the State of Iowa prohibiting the sale of intoxicating liquors was considered in its application to a sale made in the original package by one who imported the liquor from a neighboring State,

it was held that, in reference to liquors so imported and sold, the statute was of no effect, because of its interference with interstate commerce. This decision has since been followed in *Lyng* v. *Michigan*, 135 U. S. 161, *Minnesota* v. *Barber*, 136 U. S. 313, *Brimmer* v. *Rebman*, 138 U. S. 78, and *Voight* v. *Wright*, 141 U. S. 62. See also *In re Rahrer*, 140 U. S. 545; *Crutcher* v. *Kentucky*, 141 U. S. 47, 61; *Gibbons* v. *Ogden*, 9 Wheat. 1; *Brown* v. *Maryland*, 12 Wheat. 419. *Leisy* v. *Hardin* expressly overruled *Peirce* v. *New Hampshire*, 5 How. 504, which for a long time had been supposed to settle the law in regard to the sale of intoxicating liquors brought from one State to another. But the principle on which *Peirce* v. *New Hampshire* was decided, namely, that until Congress passes an act expressly authorizing commerce in an article the States may prevent the importation of it, had previously been declared erroneous, in cases in which it was held that the absence of legislation by Congress in regard to commerce in ordinary articles of trade between the States was equivalent to a declaration that such commerce should be free and unrestricted. *State Freight Tax case*, 15 Wall. 232. *Welton* v. *Missouri*, 91 U. S. 275. *Robbins* v. *Shelby Taxing District*, 120 U. S. 489. *Bowman* v. *Chicago & Northwestern Railway*, 125 U. S. 465. *Leloup* v. *Port of Mobile*, 127 U. S. 640. *Asher* v. *Texas*, 128 U. S. 129. *Stoutenburgh* v. *Hennick*, 129 U. S. 141. The decision in *Leisy* v. *Hardin* was nothing more than the application of general principles which had previously been established by the court to a particular subject. It had long before been held that a State could not restrict the sale in the original packages of liquors imported from foreign countries, and the prohibitory and restrictive statutes of the States had always excepted such liquors from their provisions. *Brown* v. *Maryland*, 12 Wheat. 419. But the Constitution gives the States no more power to interfere with commerce among the States than with commerce with foreign nations, and when it was settled that Congress was not called upon to make enactments in regard to particular articles in order to protect them, and that silence was equivalent to an express declaration that commerce should be unrestricted in all articles of such a nature as ordinarily to be subjects of purchase and sale, the decision in *Leisy* v. *Hardin* followed of necessity. The result could have

been avoided only by holding that intoxicating liquors were not articles of commerce, and to do that would have been to contradict a fact of common knowledge, as well as to set aside our laws in regard to import duties, and also the previous decisions of the court. *Brown* v. *Maryland, ubi supra.*

It is held that as to matters of merely local concern, calling for special rules adapted to the locality, the States may pass laws affecting commerce, in the absence of controlling action by Congress. *Cooley* v. *Port Wardens of Philadelphia*, 12 How. 299. But where the subject is national in its character, demanding one uniform system, like transportation from State to State, and trade between citizens of different States, there can be no local legislation without the express authority of Congress.

I understand that the majority of the court treat these propositions as settled by the Supreme Court of the United States, but hold that oleomargarine is not an article which in its nature would ordinarily be a subject for traffic, and is not entitled to protection under the implied declaration of Congress that commerce in such articles shall not be interfered with by the Legislature of a State. Undoubtedly there are articles so dangerous to life or health that they cannot properly be subjects of commercial dealings. *Bowman* v. *Chicago & Northwestern Railway,* 125 U. S. 465, 489. *In re Rahrer,* 140 U. S. 545, 555. *Crutcher* v. *Kentucky,* 141 U. S. 47, 60. To such an article the Constitution of the United States has no application, and in regard to such Congress has no right to legislate.

It is to be taken as a fact under the report that the oleomargarine sold by the petitioner is a valuable article of food, wholesome, palatable, and nutritious. It is also agreed that it was manufactured and sold in accordance with the requirements of the Act of Congress of August 2, 1886, which contains elaborate provisions regulating the manufacture and sale of this product. It must therefore have had, upon each package of it, a printed label showing that it was oleomargarine legally manufactured. 24 U. S. Sts. at Large, 210. It is agreed that it naturally had a light yellowish color, and that it was artificially colored in imitation of yellow butter by the use of coloring matter which was not deleterious. It is a fact of common knowledge that butter is often artificially colored yellow, because it is

generally considered more attractive and desirable when so colored than when very light in color. This is doubtless equally true of oleomargarine.

The only ground on which it can be contended that oleomargarine like that sold by the petitioner is not an article which may be dealt in by merchants under the common law, and may be a subject of commercial regulation under the Constitution, is the fact that by reason of its appearance it may be fraudulently sold for something better than it is. If all articles whose appearance makes it easy to deceive purchasers in regard to their qualities should be excluded from commerce, and denied protection under the Constitution, the business of our merchants would be small indeed. I think we are hardly prepared to hold that no cloth whose fabric is so carded and spun and woven and finished as to give it the appearance of being wholly wool, when in fact it is in part cotton, can be a subject of commercial transactions, or that no jewelry which is not gold but is made to resemble gold, and no imitations of precious stones, however desirable they may be considered by those who wish to wear them, shall be deemed articles of merchandise in regard to which Congress may make commercial regulations.

The prevention of frauds is recognized as a ground for the exercise of the police power, but the possibility that persons may be deceived in the qualities of goods which they buy furnishes the least important of all the reasons for protective legislation. Danger to life or health or morals is a far more important ground for interference with individual action. It seems to me that the fact that intoxicating liquors are often so used as to promote crime, ruin health, and produce poverty and degradation, furnishes a tenfold stronger reason why the court in *Leisy* v. *Hardin* should have held that they were not articles of commerce within the meaning of the Constitution, than the possibility that oleomargarine, which is a good, wholesome food, may be sold for butter furnishes for excluding it from the marts of the world.

The exception to which I have referred should be construed with great strictness, and anything which is valuable for use, and which people may wish to buy and sell, should not be declared an outlaw in the realms of trade without strong reasons for the declaration.

The question before us is one of fact, whether oleomargarine colored in the usual way is not to be recognized as an article to be bought and sold among merchants. It is a question which has reference, not to the desires or interests of the people of any particular neighborhood, but to the interests of the civilized world. It ought to be decided by us, upon the facts agreed, as it should be by Congress or by any of the Federal courts. If it is a proper article of commercial traffic, our Legislature had no jurisdiction to legislate against the importation and sale of it in the original packages ; and if the St. of 1891, c. 58, be deemed a declaration that it is not an article of commerce, the declaration, being one which the Legislature had no authority to make, is of no effect. A legislature or a court whose jurisdiction depends on the existence of a certain fact can do nothing towards creating for itself a jurisdiction by declaring that the fact exists when it does not exist. In this respect the question arising under the Constitution of the United States stands differently from those questions arising under the Constitution of our State. In reference to the latter, it being possible to practise frauds in the sale of this commodity, and the statute professing to be enacted for the protection of the people in this particular, and it not appearing that this profession is entirely unfounded, the court cannot inquire into the correctness of the decision of the Legislature or the wisdom of its action within its field. But in respect to the former the legislative declaration goes for nothing unless the fact exists which gives jurisdiction to make it. The question decided in *Powell* v. *Pennsylvania*, 127 U. S. 678, cited in the opinion of the majority, had no reference to the article of the Constitution now under consideration, nor to a case where the Legislature had no jurisdiction to act. Upon the question in issue we have the opinion of Congress expressed in the Act of August 2, 1886, which makes the manufacture of oleomargarine a source of internal revenue to the United States, and speaks as strongly as language can in favor of the proposition that this product may properly be manufactured and carried from place to place and sold. In *United States* v. *Eaton*, 144 U. S. 677, just decided, the Supreme Court of the United States has recognized the validity of this act, and impliedly held that oleomargarine is a legitimate article of commerce. The case of *State* v. *Newton*, 21 Vroom, 534, cited

in the opinion of the majority, was decided before the decision of the Supreme Court of the United States in *Leisy* v. *Hardin*.

It seems to me that oleomargarine, legally manufactured, which is absolutely unobjectionable except that by reason of its resemblance to butter dishonest persons may sell it for butter, is as much a subject for commercial dealings as anything. else which is bought and sold among merchants. No authority has come to my knowledge which tends at all to show that such a commodity is not an article of commerce. It is very proper that stringent laws should be passed to prevent frauds in the sale of it, but in my opinion we cannot say that Congress has no power to make laws which will secure the right to export it or import it, or to sell it anywhere, in the original package.

I will not discuss the question whether the statute should be held unconstitutional, or merely inoperative and in abeyance, so long as commerce in oleomargarine is left by Congress unrestricted. See *In re Rahrer*, 140 U. S. 545; *Commonwealth* v. *Gagne*, 153 Mass. 205; *Commonwealth* v. *Calhane*, 154 Mass. 115.

I am authorized to say that Mr. Justice Lathrop concurs in this opinion.