COFFEE-RICH, INC. *vs.* COMMISSIONER OF PUBLIC HEALTH & others.

Suffolk.     December 7, 1964. — February 2, 1965.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, SPIEGEL, & REARDON, JJ.

*Food. Constitutional Law,* Police power, Due process of law, Food. *Words,* "Imitation."

In the provision of the "First" paragraph dealing with food in G. L. c. 94, § 187, as amended through St. 1948, c. 598, § 2, that "this paragraph shall not be construed to permit the imitation of any food for which a standard has been established by law, other than as specifically provided herein," the word "herein" refers to the whole of c. 94 and not merely to § 187. [417–418]

A certain vegetable substitute for cream which looked like cream and tasted like cream when used in coffee was "in imitation or semblance of" cream within the terms of G. L. c. 94, § 187, as amended through St. 1948, c. 598, § 2, although differentiated from cream in some attributes, and, in view of the statutory standard established for cream

in c. 94 and absence of any specific provision therein permitting such imitation, was "misbranded" within the terms of §§ 187, 189A, 191, irrespective of how it was labeled or distributed.   [418–419]

Where a wholesome vegetable product designed for use in coffee as a substitute for cream closely resembled cream and was an "imitation" thereof and "misbranded" within the terms of G. L. c. 94, § 187, as amended through St. 1948, c. 598, § 2, and was sold in cartons resembling cream cartons in material and shape, but it appeared that the product was distributed only through retail stores and, unlike cream, was sold in frozen form in the "frozen food" sections of the stores, that the cartons in which the product was sold were conspicuously labeled with its brand name and a description of it as "a vegetable product" containing "no milk or milk fat," and that advertising on the counters in the stores stated the product to be "frozen, non-dairy," so that there was no reasonable likelihood of the average consumer's mistaking it for cream, an application of c. 94, §§ 187, 189A, 191, to the product, so distributed, as a "misbranded" product was, under the Massachusetts Constitution, an improper exercise of the police power violative of arts. 1, 10, 12, of the Declaration of Rights and Part II, c. 1, § 1, art. 4.   [423–424, 426]

BILL IN EQUITY filed in the Supreme Judicial Court for the county of Suffolk on March 31, 1964.

The suit was reserved and reported by *Spiegel,* J., without decision.

*Francis J. Larkin & Elliot H. Levitas,* of Georgia (*Edward J. McCormack, Jr., & Ellis Arnall,* of Georgia, with them), for the plaintiff.

*David Berman,* Assistant Attorney General (*David Lee Turner,* Assistant Attorney General, *& Benjamin Gargill,* Assistant Attorney General, with him), for the defendants.

SPIEGEL, J.   This is a bill in equity for a declaratory decree regarding the applicability of G. L. c. 94, § 187 (as amended through St. 1948, c. 598, § 2), and § 191, to Coffee-Rich, a liquid vegetable product manufactured and sold by the plaintiff; and, inter alia, to enjoin the defendants from enforcing these statutory provisions against the plaintiff. The case was presented upon a statement of agreed facts plus certain exhibits to the single justice, who reserved and reported it "without decision for the determination of the full court."

We herewith summarize the pertinent facts.   At its principal office and plant in New York, the plaintiff manufactures Coffee-Rich, "a pasteurized, homogenized blend of water, vegetable fats, corn syrup solids, sodium caseinate,

sodium citrate, carrageenin, sorbitan monostearate, poly-sorbate 60 and . . . beta carotene.'' Coffee-Rich contains no animal fat, milk, milk fat or any other component of cream or milk, and is completely safe for consumption by humans. It is ''designed to serve many of the same uses as cream.'' ''Beta carotene contributes the off-white or tannish color of 'Coffee-Rich' to give it a color which, in the judgment of its inventors, is more appetizing than the stark white color it would have otherwise.'' So colored, Coffee-Rich looks like cream. Although it has a distinct flavor when tasted alone, when mixed with coffee it cannot ordinarily be distinguished from cream or milk which are so mixed. On the other hand, Coffee-Rich is unlike cream in certain respects. It resists curdling, and under normal refrigeration it ''is designed to remain sweet, and unsoured for about three weeks.'' It contains forty-four calories per ounce, whereas twenty per cent butterfat cream contains fifty-five calories per ounce. When mixed with hot coffee, it does not ''feather off''[1] or ''oil off''[2] as cream sometimes does.

Coffee-Rich is sold as a frozen food product in Massachusetts, and is ''displayed in and purveyed only from the 'Frozen Food' sections of . . . various retail outlets. . . . Cream, half and half or milk are not customarily sold'' in this manner. Retail containers of Coffee-Rich are of the same size and shape as those in which orange juice, lemonade and grape juice are sold. The plaintiff has spent ''large sums of money'' to advertise and promote Coffee-Rich in Massachusetts and other States. ''Advertisements and other sales aids utilized by . . . [the plaintiff] inform and educate the potential consumer as to the nature of the product and enable the consumer who reads the advertising materials, sales aids and the label of the container to differentiate between 'Coffee-Rich' and dairy products.''

A poster which appears on the frozen food counters where Coffee-Rich is found plainly describes Coffee-Rich as a

---

[1] To form a whitish, chalky scum on the surface of coffee.

[2] To form globules of fat on the surface of coffee.

"frozen, non-dairy" product. We note that the Coffee-Rich container is made of waxed cardboard and that, when properly sealed, it is opened by bending back two joined folds at the top so that a spout is formed. The container closely resembles those in which cream or milk is commonly sold.[3] On its face conspicuously appear, inter alia, the brand name, "COFFEE RICH"; the words, "A VEGETABLE PRODUCT CONTAINS NO MILK OR MILK FAT"; and, directly thereunder, the words, "TO WHITEN AND ENRICH COFFEE." To the right of these words appears a simple drawing of a small pitcher pouring a liquid into a cup. On the side of the container the ingredients are accurately listed. The suggested retail price of one pint of this product in Massachusetts is twenty-nine cents. During 1963 the average retail price of one pint of ungraded cream ranged between forty-three and forty-five cents.

On January 22, 1964, Robert E. Rich, president of Coffee-Rich, Inc., informed the Director of the Division of Food and Drugs of the temporary withdrawal "under protest" of Coffee-Rich from the "institutional market in Massachusetts." However, Rich indicated an intention to continue the marketing of Coffee-Rich for retail sale in this State. In response, the director gave notice on February 3, 1964, of his intention to "apply Section 187, C. 94 of the General Laws to any and all sales of 'Coffee-Rich' in Massachusetts, including . . . retail sales," and to "take . . . steps . . . to prevent such sales." He warned that he would "exercise all the powers afforded . . . [him] by . . . law . . . against . . . [the] Company directly, its brokers, agent, employees, distributors, customers, retail outlets and the like."

I. General Laws c. 94, § 187, as amended through

---

[3] Although none of the parties has made any reference thereto, we note that, between the folds which bend to form the spout, the container bears a label, partly hidden by the folds, which says, inter alia, "Pure-Pak," and, in much smaller lettering, barely legible, "your personal milk container." These words are apparently printed by the manufacturer of the carton. We think that, in relation to the rest of the labeling on the carton, they are in no way confusing to the purchaser.

St. 1948, c. 598, § 2,[4] deems food "misbranded" if it is "in imitation or semblance of any other food" unless, in certain cases, it is labeled as such an imitation. But the section does not permit the imitation, even with such labeling, "of any food for which a standard has been established by law, other than as specifically provided herein." The words "specifically provided herein" refer to all of c. 94, rather than merely to § 187, since that section contains no provision allowing the imitation of a food for which there is a statutory standard. *Aeration Processes, Inc.* v. *Commissioner of Public Health,* 346 Mass. 546, 547. "There are in c. 94 some sections that allow the imitation of foods for which standards are set by statute provided labeling requirements more specific than those of § 187 are met. See §§ 49, 54, oleomargarine; § 50, 'imitation cheese'; § 1, definitions of butter and cheese. Statutory standards for cream and ungraded cream are established by G. L. c. 94, § 12, as amended through St. 1955, c. 757, § 2.[5] Chapter 94 contains no provision that permits the imitation of cream by combining nonmilk constituents."[6] *Id.* at 547–548. Thus, if

---

[4] This section provides, in part: "For the purposes of said sections an article shall also be deemed to be misbranded: — . . . In the case of food: First, if it is in imitation or semblance of any other food; provided, that this paragraph shall not apply to an imitation of a food for which a standard of quality or identity has been adopted under the provisions of section one hundred and ninety-two, nor to an imitation of any other food for which no standard has been established by law or regulation, if its label bears in type of uniform size and prominence, the word 'imitation,' and, immediately thereafter the name of the food imitated; and, provided further, that this paragraph shall not be construed to permit the imitation of any food for which a standard has been established by law, other than as specifically provided herein."

Section 192 of c. 94 grants the Department of Public Health power to promulgate regulations setting standards for foods where standards are not otherwise prescribed by law.

[5] This section provides, in part: "The Massachusetts legal standard for cream or ungraded cream shall be cream which upon analysis is shown to contain not less than sixteen per cent of milk fat. The Massachusetts legal standard for the grades to be known as light cream, medium cream, heavy cream and extra heavy cream shall be cream which upon analysis is shown to contain not less than sixteen, twenty-five, thirty-four and thirty-eight per cent, respectively, of milk fat."

[6] Section 17A prohibits the manufacture, sale or possession for sale, of milk, cream or skimmed milk to which any fat or oil other than milk fat has been added "so that the resulting product is in imitation or semblance of milk, cream or skimmed milk . . . ." The addition of milk fat to such products is, however, not prohibited by § 17A provided the product is not sold as pure milk: "No person . . . shall sell . . . or have in his possession with intent to sell . . . *as pure milk,* any milk, cream, or skimmed milk . . . to which has been added . . . any milk fat" (emphasis supplied).

Coffee-Rich is "in imitation or semblance" of cream, "it is misbranded however labeled or sold, and is subject to an embargo under c. 94, § 189A; also, whoever delivers or offers to deliver such a misbranded product is subject to the criminal penalty provided in c. 94, § 191." *Id.* at 548.

In *Aeration* we said that § 187 "precludes consideration of the veracity or effect of food product labeling in determining whether the product is an imitation." *Id.* at 551. We held that "Instantblend is an imitation within § 187 because (1) it resembles cream but does not conform to the statutory standards therefor, (2) apart from information supplied by labeling, there is a likelihood that an average consumer, aware of Instantblend's intended use, will confuse it with cream, and (3) there is no showing that Instantblend and cream are so differentiated in the mind of the average consumer interested in the distinction that, by making reasonable effort, he would discover with which product he is confronted. That many attributes of Instantblend differentiate it from cream does not take it out of the statutory category of an imitation. The significant properties are those which, being apparent, may cause it to be mistaken, or accepted, for cream." *Id.* at 553–554.

We think that Coffee-Rich unmistakably falls within the proscription of § 187, as did Instantblend in the *Aeration* case, as "in imitation or semblance" of cream. Although it is not cream, it is designed to be used in place of cream. It looks like cream, and, when used in coffee, it tastes like cream. Our holding in *Aeration,* quoted above, applies in all respects to Coffee-Rich.

We are aware of the usual connotations of the word "imitation" which are elaborately expounded by the plaintiff and which might have persuaded courts in other jurisdictions to hold Coffee-Rich or products like it as outside the statutory meanings of the word. See *Coffee-Rich, Inc.* v. *Kansas State Bd. of Health,* 192 Kans. 431, 437–438; *Dairy Queen of Wis. Inc.* v. *McDowell,* 260 Wis. 471, 476–477. But see, *United States* v. *651 Cases, More or Less, of Chocolate Chil-Zert,* 114 F. Supp. 430, 432–433. However, our

statute speaks not simply of "imitation," but of "imitation *or semblance*" (emphasis supplied). We are thus concerned, as we were in *Aeration,* with actual or apparent resemblance or similarity. See Webster's Third New Intl. Dictionary at p. 2062. Section 187 must be construed in this light. To the extent that *Carey, as Commr. of Agriculture & Mkts. of N. Y.* v. *Instantwhip Schenectady, Inc.* 14 App. Div. 2d (N. Y.) 467, 468, defines "imitation or semblance" differently, we are disinclined to follow it in view of our holding in *Aeration.*

II.   However, our conclusion that Coffee-Rich is "misbranded" because it is "in imitation or semblance" of cream does not end the matter. In *Aeration* we expressly left open the question whether prohibition of "the sale of an admittedly nutritious product . . . may be imposed under the State Constitution notwithstanding a showing that substantial confusion could not result because the product . . . [is] distinctively labeled. . . . The evidence . . . [in that case demonstrated] only that Instantblend . . . [was] distributed for use at public or employer maintained eating places. The labeling on the bulk package is, of course, inconsequential in respect of such use. The evidence . . . [showed] that as . . . [thus] distributed there . . . [was] a substantial risk that Instantblend . . . [would] be confused with cream.[7]   The supplying of signs for use on dispensers in eating establishments, which may not be used, or if used may not be seen, is not an adequate means of informing the consumer what he is consuming." We concluded that "[t]he facts . . . [did] not require us to consider whether the statute would be unconstitutional in application if relied on to bar distribution in retail stores, or elsewhere, in such a way that consumers would be informed as to the nature of the product sold or served and there

---

[7] In *Aeration* "[t]here was evidence that when an inspector from the Division of Food and Drugs, at a lunch counter, ordered a cup of coffee with cream on the side he was served black coffee and a one ounce glass container of a white liquid (later identified by the manager as Instantblend) taken from a dispensing device or 'creamer.' He saw no sign on the creamer and was sure that there was none." 346 Mass. 546, 550.

would be no reasonable possibility of their mistaking it for cream.'' 346 Mass. 546, 554–555.

We recognize that total prohibition by a State of the sale of a distinctively labeled, wholesome food product is a method permissible under the Fourteenth Amendment to avoid consumer confusion with other food products. *Aeration Processes, Inc.* v. *Commissioner of Pub. Health,* 346 Mass. 546, 554. *Powell* v. *Pennsylvania,* 127 U. S. 678. *Hebe Co.* v. *Shaw, Secretary of Agriculture of Ohio,* 248 U. S. 297. *Sage Stores Co.* v. *Kansas ex rel. Mitchell (Substituted as Atty. Gen.)* 323 U. S. 32. Cf. *Carolene Prod. Co.* v. *United States,* 323 U. S. 18. But see *Defiance Milk Prod. Co.* v. *DuMond, as Commr. of Agriculture & Mkts. of N. Y.* 309 N. Y. 537. However, we do not decide this case upon a Federal ground. What is permissible under the Federal Constitution in matters of State economic regulation is not necessarily permissible under State law. The Constitution of a State may guard more jealously against the exercise of the State's police power. See *Minnesota* v. *National Tea Co.* 309 U. S. 551. Cf. *Pugliese* v. *Commonwealth,* 335 Mass. 471, 475. Accordingly, the Federal cases to which we have referred do not here compel a like result. We need not follow them since we decide this case in light of our State Constitution, particularly arts. 1, 10 and 12 of the Declaration of Rights,[8] and Part II, c. 1, § 1, art. 4.[9]

---

[8] Article 1 provides: ''All men are born free and equal, and have certain natural, essential, and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing, and protecting property; in fine, that of seeking and obtaining their safety and happiness.''

Article 10 provides, in part: ''Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws.''

Article 12 provides, in part: ''[N]o subject shall be . . . deprived of his property, immunities, or privileges, put out of the protection of the law . . . but by the judgment of his peers or the law of the land.''

[9] ''[F]ull power and authority are hereby given and granted to the . . . general court, from time to time, to make, ordain, and establish, all manner of wholesome and reasonable orders, laws, statutes, and ordinances, directions and instructions, either with penalties or without; so as the same be not repugnant or contrary to this constitution, as they shall judge to be for the good and welfare of this commonwealth, and for the government and ordering thereof, and of the subjects of the same . . . .''

Whether the prohibition of Coffee-Rich from retail sale in Massachusetts is a valid exercise of the police power depends on whether such prohibition "bears a real and substantial relation to the public health, safety, morals, or some other phase of the general welfare." *Sperry & Hutchinson Co.* v. *Director of the Div. on the Necessaries of Life,* 307 Mass. 408, 418. See *Anton's of Reading, Inc.* v. *Reading,* 346 Mass. 575, 576–577. "All rational presumptions are made in favor of the validity of every legislative enactment. Enforcement is to be refused only when it is in manifest excess of legislative power." *Commonwealth* v. *Finnigan,* 326 Mass. 378, 379. "It is not for us to inquire into the expediency or the wisdom of the legislative judgment. Unless the act of the Legislature cannot be supported upon any rational basis of fact that reasonably can be conceived to sustain it, the court has no power to strike it down as violative of the Constitution. . . . But unless justified as a valid exercise of the police power, the act must be declared unconstitutional because the enforcement of it will deprive the . . . [plaintiff] of rights secured under the Constitution." *Sperry & Hutchinson Co.* v. *Director of the Div. on the Necessaries of Life, supra,* at 418. In *Mansfield Beauty Academy Inc.* v. *Board of Registration of Hairdressers,* 326 Mass. 624, we held that a statute forbidding a proprietor of a hairdressing and manicuring school to charge for materials provided to persons acting as models for the students of the school was not a proper exercise of the police power because "there . . . [was] no rational connection between the promotion of public health and the interdiction of such a charge." *Id.* at 627. Similarly, we held in *Sperry & Hutchinson Co.* v. *Director of the Div. on the Necessaries of Life,* 307 Mass. 408, that a statute prohibiting the use of trading stamps in connection with sales of motor fuels and the changing of prices for twenty-four hours was not a valid exercise of the police power because it bore no reasonable relation to the prevention of fraud on consumers. For further treatment of the question of valid exercise of the police power under the Constitution, see,

e.g., *Wyeth* v. *Board of Health of Cambridge*, 200 Mass. 474, 480; *Opinion of the Justices*, 322 Mass. 755; *Opinion of the Justices*, 337 Mass. 796.

In view of the foregoing, we proceed to determine the applicability of G. L. c. 94, §§ 187 (as amended) and 191, to the sale of Coffee-Rich. Since this product is admittedly wholesome, there is nothing to justify an embargo of it on the basis of protecting the public health or safety. Other grounds, then, must be considered. We said in *Aeration Processes, Inc.* v. *Commissioner of Pub. Health*, 346 Mass. 546, 550, that § 187 "is designed to avoid confusion of other products with defined and familiar foods. Section 187, read with § 12, reflects the policy that the public shall not be exposed to the risk of mistaking for cream, milk or skimmed milk something that is not that product as defined by the statute." But to prohibit the sale of Coffee-Rich in the circumstances of this case is not a reasonable means of realizing this purpose. Although Coffee-Rich closely resembles cream and is a substitute therefor, it is sold from the frozen food sections of retail stores in accurately and distinctively labeled cartons. Unlike Coffee-Rich, milk and cream are customarily not sold in frozen form. Conspicuous lettering on the container of this product announces to all who can read that Coffee-Rich is a "vegetable product" which "contains no milk or milk fat." We think that average consumers are aware that milk and cream are not "vegetable product[s]." Similarly, advertising matter displayed on the frozen food counters from which Coffee-Rich is purveyed clearly and conspicuously states that Coffee-Rich is a "frozen non-dairy" product. Again, we think that average consumers are aware that milk and cream are dairy products. It is true that the Coffee-Rich container (apart from the labeling thereon) resembles those often used for milk and cream. But so also does it resemble those used for orange juice. The fact that Coffee-Rich is sold in waxed cartons instead of cans or bottles cannot be determinative. What matters is the effect of the packaging together with its labeling, and we see no rational basis for

concluding that the containers in which Coffee-Rich is sold tend to confuse or mislead. We do not believe that an average consumer would buy this product under the mistaken impression that it is milk or cream.

The defendants contend, however, that the "reasonableness" of totally prohibiting the sale of Coffee-Rich to prevent "fraud, deception and confusion becomes abundantly clear from a consideration of the possible uses of this product." They argue that "[a]lthough . . . the . . . product is at present sold only in retail markets . . . , there is no adequate means of preventing a common victualer or other institutional user from purchasing large quantities of 'Coffee-Rich' and selling it under the guise of cream." But whatever the consequences of such possible fraudulent action, they need not be visited on the manufacturer who makes a wholesome product and in no way misleads any reasonable person as to its nature. The defendants' reasoning, if upheld, would sanction an embargo on the sale of plainly labeled horsemeat, for example, on the ground that institutional users might buy it and serve it in the guise of beef. Similarly, the sale of harmless artificial sweeteners could be prohibited on the ground that restaurateurs who purchase them might fraudulently substitute them for sugar in food and drink which they prepare for customers. We are hardly prepared to hold, as the defendants' argument would logically lead us, that "cloth whose fabric is so carded and spun and woven and finished as to give it the appearance of being wholly wool, when in fact it is in part cotton, . . . [may validly be prohibited from sale regardless of proper labeling], or that [the Legislature may validly deem that] no jewelry which is not gold but is made to resemble gold, and no imitations of precious stones, however desirable they may be considered by those who wish to wear them . . . [may be sold at all because they might be deceptively sold as the genuine article]." *Commonwealth* v. *Huntley,* 156 Mass. 236, 250 (Knowlton, J., dissenting). In the instant case, a less arbitrary approach to protect consumers from fraud and confusion, and a particularly

obvious one, would be to penalize those who actually practice the deception rather than the guiltless producer or distributors of Coffee-Rich and, indirectly, those consumers who want to purchase the product precisely because it is a nondairy product.

It seems to us that the defendants' reasons for attempting to prohibit the sale of Coffee-Rich are more fanciful than real. See *Opinion of the Justices,* 322 Mass. 755, 761. There is nothing in the record to suggest that such deception by common victualers or institutional users prevails or even exists in Massachusetts. Legislative ''regulations must be reasonable in their nature, directed to the prevention of real evils and adapted to the accomplishment of their avowed purpose. Under the guise of protecting the general welfare there cannot be arbitrary interference with business or irrational or unnecessary restriction.'' *Opinion of the Justices,* 247 Mass. 589, 595–596. *Sperry & Hutchinson Co.* v. *Director of the Div. on the Necessaries of Life,* 307 Mass. 408, 425.

It is true that in *Commonwealth* v. *Huntley,* 156 Mass. 236, 243–244, we said with regard to St. 1891, c. 58, that the ''Legislature, while allowing the sale of oleomargarine in such form as will indicate its real character to the consumer, has determined that its manufacture and sale, when it is made in imitation of yellow butter, is so productive of deception and fraud as to call for a prohibition of such manufacture and sale.'' We held that St. 1891, c. 58, was a valid police regulation, and not an unconstitutional interference with interstate commerce. Similarly, in *Commonwealth* v. *Russell,* 162 Mass. 520, 521, we said that St. 1891, c. 58, § 1, ''only saves such oleomargarine as is free from coloration or ingredient that causes it to look like butter. The statute did not intend to allow oleomargarine to be made or sold when so colored, whether the particular purchaser was advised of its real character or not. It could easily be sold again to persons who were not advised of it.'' To the same effect is *Commonwealth* v. *Kelly,* 163 Mass. 169. See *Commonwealth* v. *Wheeler,* 205 Mass. 384, 387 (dictum).

We note that these cases do not involve a consideration of the effect of the State Constitution, and are distinguishable on that basis from the case at bar. However, to the extent that they are inconsistent with our holding in this case, we do not follow them.

We conclude that, on the facts of this case, there is no rational basis for prohibiting the sale of Coffee-Rich, an admittedly nutritious product which is distinctively labeled. See *State* v. *A. J. Bayless Mkts. Inc.* 86 Ariz. 193, 197; *Defiance Milk Prod. Co.* v. *DuMond, as Commr. of Agriculture & Mkts. of N. Y.* 309 N. Y. 537, 541; *Cott Beverage Corp.* v. *Horst,* 380 Pa. 113, 119–123.

III. Therefore, we hold that G. L. c. 94, §§ 187 (as amended), 189A,[10] and 191, as applied to Coffee-Rich substantially as it is presently being sold are unconstitutional under arts. 1, 10 and 12 of the Declaration of Rights, and Part II, c. 1, § 1, art. 4.

IV. An injunction shall issue against the defendants in accordance with this opinion, restraining them from enforcing G. L. c. 94, §§ 187 (as amended), 189A, and 191, with regard to the sale of Coffee-Rich substantially as it is presently being sold. The details of the injunction shall be determined by the single justice.

*So ordered.*

---

[10] This section enables, inter alia, an embargo of "misbranded" food. Although neither the pleadings nor the briefs refer thereto, in order to avoid further unnecessary controversy, our holding applies to it.