STATE OF MISSOURI, Respondent, *v.* D. T. ADDINGTON, Appellant.

May 16, 1882.

1. The statute of March 24, 1881, concerning the manufacture and sale of oleaginous substances for food, prohibits the manufacture and sale of the articles mentioned therein, irrespective of any question of an intention to deceive.

2. The act is not in conflict with the constitutional provision relating to the right of all persons to the enjoyment of the gains of their industry.

3. It is not in conflict with the constitutional provision, that no person shall be deprived of property without due process of law, so far as its provisions are prospective.

4. The passage of the act was not an unreasonable exercise of the police power of the state.

5. That the article is wholesome, does not prevent the legislature from prohibiting its manufacture and sale, if it is a not easily detected counterfeit of a well-known article of food.

6. If the manufactured article is likely to deceive, and is difficult to detect, that the manufacturer practices no fraud on the retailer is of no consequence.

7. The act is not in violation of the provisions of the constitution of the United States concerning the exclusive right of congress to regulate commerce between the states.

8. The provisions of the constitution of the United States, concerning the regulation of commerce between the states, imposes no restriction upon the reasonable exercise of the police power of the state.

APPEAL from the St. Louis Court of Criminal Correction, CADY, J.

*Affirmed.*

LYNE S. METCALFE, JR., for the appellant; FRANKLIN FERRISS, of counsel.

JOHNSON, LODGE & JOHNSON, for the respondent.

THOMPSON, J., delivered the opinion of the court.

The defendant, a wholesale grocery broker in the city of St. Louis, was tried in the court of Criminal Correction, on

information charging him with the misdemeanor of selling an article of food known as " oleomargerine," or " suine," contrary to the following statute : —

"An act to prevent the Manufacture and Sale of Oleaginous Substances, or Compounds of the same, in Imitation of the Pure Dairy products. Sect. 1. Whoever manufactures, out of any oleaginous substances, or any compounds of the same, other than that produced from unadulterated milk or cream from same, any article designed to take the place of butter or cheese, produced from pure, unadulterated milk or cream of the same ; or whoever shall sell or offer for sale the same, as an article of food, shall, on conviction thereof, be confined in the county jail not exceeding one year, or fined not exceeding one thousand dollars, or both.

"Approved March 24, 1881."

The defendant pleaded not guilty.

At the trial the following facts were agreed to : —

" It is agreed, for the purposes of this trial, that defendant sold to the prosecuting witness, in the city of St. Louis, on the first day of November, 1881, one original package of an oleaginous substance or compound, other than that produced from unadulterated milk or cream from the same, bearing a general resemblance to butter, and sold as an article of food ; that said package was sold as ' suine', or ' oleomargerine,' and was branded as such ; that there was no pretence that the same was butter ; that suine is known to the trade to be substantially the same thing as oleomargerine, and is produced by the same process ; that said article was manufactured in the state of Illinois and shipped to defendant in this city."

A witness was then called to the stand and sworn on behalf of the defendant, who stated that he was a chemist by profession ; that he had made a chemical analysis of the article sold by the defendant in this case, both quantitive and qualitative. He was then asked to state the chemical com-

position of the article sold by the defendant, and give the comparison of the same with pure butter, and to state whether or not it was a wholesome article of food. The counsel for the state objected, on the ground that the evidence called for was incompetent and immaterial. The objection was sustained by the court, and the defendant excepted.

The defendant then offered to prove by this witness that he had made a comparative analysis of the article sold by the defendant, with pure dairy butter; that the article or compound sold by the defendant was composed substantially of the same elements as pure butter, in slightly varying proportions; that both are mainly composed of pure animal fat, which undergoes no chemical change, either in the process of making butter or in making the said article sold by the defendant, the change in both cases being mechanical; that the said compound sold by the defendant is, in all respects, as healthful and nutritious as pure butter, and is no more liable to adulteration or deception than pure butter; that the said compound, when fresh, is more wholesome than any butter not in a perfectly pure state, and when not fresh is no more injurious than butter equally stale; that the said article will keep as well as pure butter, and, from a sanitary point of view, is in all respects as harmless and desirable a commodity as pure dairy butter. To all of which offer of proof the counsel for the state objected. The objections were sustained by the court, and the defendant excepted.

The defendant was then found guilty by the court, and a nominal fine of $25 imposed.

1. The first point relied on to reverse this judgment, is that the statute must be taken in connection with the previous statute on the same subject (1 Rev. Stats., sect. 1599), and that, taking the two statutes together, the word " designed," in this statute, is to be read " with intent to deceive." We shall not discuss at length a proposition so obviously unten-

able.   The previous statute read as follows :  " If any person shall sell or offer for sale any compound resembling butter in appearance, manufactured from cattle fat or beef suet, or other article, known to the trade as oleomargerine, unless the same shall be clearly and indelibly marked on every package, with some name or brand by which it may be clearly and easily distinguished from butter, he shall be deemed guilty of a misdemeanor."   The present statute goes further, and prohibits the manufacture and sale of such articles altogether in this state.   It was obviously passed in the form of a sweeping prohibition, because the legislature were of opinion, after two years' experience with the previous statute, that it was ineffective to prevent our people from being defrauded by having an artificial compound sold to them as real butter.   The design of the manufacturer and seller may be perfectly honest ; but the person to whom they may sell the article may be dishonest ; and, therefore, the legislature thought it best to lay the axe at the root of the tree, by prohibiting entirely the manufacture and sale of such compounds within this state.

2. It is next claimed that if this statute is not to have this meaning — that is, if we are to hold as we do, that it means what it says — it is unconstitutional.   Its constitutionality is assailed on the following grounds :   1. It is claimed to be an infringement of section 4, Article II., of the constitution of this state, which declares that " all persons have a natural right to life, liberty, and the enjoyment of the gains of their own industry."   This is, perhaps, the most general declaration of right in that instrument.   Clearly it does not mean that all persons have an *absolute* right to life, liberty, and the enjoyment of the gains of their own industry.   On the contrary, each of these enumerated rights is held in subordination to the rights of society.   A person has a natural right to life ; but yet that life may be taken by law as a punishment for crime.   He has a natural right to liberty, but yet his liberty may be restrained either to punish or

to prevent crime; in cases of infants, for purposes of correction; in cases of persons infected with contagious diseases, for the benefit of the public health; and in cases of insane persons, for the good of the person himself, his relatives, or the public. A person has a natural right to the gains of his own industry; and yet it is well understood and universally conceded, that in a state of civil society, there is no such thing as an absolute right of property. On the contrary, all property is held in subordination to certain paramount rights of the state and of the people. *The State* v. *Allmond*, 2 Houst. (Del.) 612; *Oviatt* v. *Pond*, 29 Conn. 479, 487. It may be taken by the state for its revenue for governmental purposes; it may be destroyed in time of war to impede the operations of the public enemy, or even in time of peace to prevent the spread of a conflagration; and in all these cases the government is not obliged to make restitution or award compensation to the owner. This being so, it is too plain for discussion that such a general declaration of right cannot be strained into a prohibition against the legislature from suppressing the manufacture and sale of a particular article of food. We must obviously look further than this for some constitutional inhibition against the statute in question.

2. Such an inhibition is supposed, by the learned counsel for the defendant, to be found in the provision of the constitution which declares that "no person shall be deprived of life, liberty, or property, without due process of law." It is suggested that the statute violates this provision, because it is retroactive in its terms — because it prohibits the sale of all manufactured compounds of the kind designated, including such as were in existence at the time of its passage. There is nothing in this point. A statute may be bad in part and good in part; and if so, that part only which is repugnant to the constitution will be held void. *Fisher* v. *McGive*, 1 Gray, 1. It may be invalid in so far as it intends to operate retrospectively, and good in so far as it operates prospectively. If this statute operates retro-

spectively, its retrospective operation does not hurt this defendant; for the sale for which he is proceeded against took place seven months after the passage of the act, and probably three months after it went into operation, and there is nothing in the record to show that the particular article, for the sale of which this defendant is prosecuted, was manufactured, or was in existence, prior to the time when the act took effect.   If such was the fact, it was for him to show it.   *Bartemeyer* v. *Iowa*, 18 Wall. 129, 134; *Beer Co.* v. *Massachusetts*, 97 U. S. 25, 33.   In the absence of such a showing, we must hold that the act does not deprive him of his property, without due process of law.   On the contrary, we must infer that he has proceeded with his eyes open, in violation of the law.   He cannot, therefore, invoke any supposed infirmity of the law on the ground that it is retroactive in its terms.   *The State* v. *Allmond*, 2 Houst. (Del.) 628, and cased cited.

3. It is also argued that this statute is void, as being an unreasonable exercise of the police power of the State.   This is an extensive and undefined power.   It has been said to be " a power to preserve the peace, promote good morals, restrain vice, and protect the property and health of the people." Ryland, J., in *The State* v. *Searcy*, 20 Mo. 490.   But extensive as this power is, it may be conceded that an act of the legislature in restraint of liberty or of property, which exceeds a reasonable exercise of it, so that in fact it is not an exercise of the police power, but a capricious invasion of private right, will be held unconstitutional and void by the judicial courts.   Thus, it is said by the supreme court of this state: "A law which unneccessarily and oppressively restrains a citizen from engaging in any traffic, or disposing of his property as he may see fit, though passed under a specious pretence of being preservative of the health of the inhabitants, would be void.   Such a law would be unreasonable, and would deprive the people of the rights guaranteed them by the organic law of the land."   *The State*

v. *Fisher*, 52 Mo. 174.   So, it is said by the Supreme Court
of Illinois:  " It is not within the power of the general
assembly, under the pretence of exercising the police power
of the state, to enact laws not necessary to the preservation
of the health and safety of the community, that will be
oppressive and burdensome upon the citizen.   If it should
prohibit that which is wholesome in itself, or command that
to be done which does not tend to promote the health, safety,
or welfare of society, it would be an injurious exercise of
power, and it would be the duty of the courts to declare
such legislation void."   *Toledo, etc., R. Co.* v. *Jackson-
ville*, 67 Ill. 37.   In a later case the same court, speaking
of this power, has used this language :  " In its more compre-
hensive sense, in its application to the various relations of
communities, when applied to matters like the subject of
this litigation [regulation of cemeteries], it may be assumed
that it is a power co-extensive with self-preservation, and
is not inaptly termed the law of overruling necessity.
It may be said to be that inherent plenary power in
the state which enables it to prohibit all things hurtful
to the comfort, safety, and welfare of society.   *   *   *
As a general proposition, it may be stated that it is the
province of the law-making power to determine when
the exigency exists calling into exercise this power.   What
are the subjects of its exercise is clearly a judicial question.
There must necessarily be constitutional limitations upon
this power.   It is essential that such regulations must have
reference to the comfort, safety, or welfare of society."
*Lake View* v. *Rose Hill Cemetery*, 70 Ill. 194, 195.

It must also be conceded that courts, in passing upon the
constitutionality of an act of the legislature, assume a very
grave responsibility ; and a statute will never be held void
unless it plainly appears that the legislature has transcended
its power in passing it.   Whenever there is a doubt, it will be
resolved in favor of the validity of the enactment.   *St. Louis
County* v. *Griswold*, 58 Mo. 192 ; *The State* v. *Able*, 65

Mo. 357. On the other hand, there is no such thing, in a free country, as absolute, unrestrained power in any branch of the government; and while there are frequent expressions to the effect that a statute will never be declared void unless the objector can put his finger upon some specific provision of the constitution which has been transcended, yet we are disposed to concede that there is, in this country, such a thing as an unwritten constitution; that there are implied reservations of private right in every free government of such an absolute character that laws infringing them will not be enforced by the judicial courts. *Loan Assn.* v. *Topeka*, 20 Wall. 655; *The State ex rel.* v. *Lindell Hotel Co.*, 9 Mo. App. 458.

But from its very nature, the police power is a power to be exercised within wide limits of legislative discretion; and if a statute appears to be within the apparent scope of this power, it would be a usurpation of jurisdiction for the judicial courts to inquire into its wisdom and policy, or to undertake to substitute their discretion for that of the legislature. *Cearfoss* v. *The State*, 44 Md. 403. The decisions in which the nature of this power has been considered will, we think, justify us in stating the following propositions: 1. The police power of a state can only be exercised with reference to some subject apparently connected with the public welfare. 2. When exercised with reference to such subjects, the limits of its exercise are, in a very large measure, in the sound discretion of the legislature. 3. This discretion, however, is not absolute and unrestrained. The power cannot be exercised capriciously, so as to strike down the right of liberty or property when no real or apparent public benefit will be promoted thereby.

Quarantine laws, inspection laws, laws regulating the storage of gunpowder, the use of steam-boilers, the carrying of fire-arms, the suppressing of gambling and bawdy-houses, and the sale of intoxicating drinks, are all familiar illustrations of this power. Within the same

category fall laws prohibiting and punishing the adultera-
tion of articles of food and drink. It may be said that
no laws more nearly touch the public welfare than laws
relating to the last-named subject. To the category of such
laws belongs the law which we are now considering. The
substance of the objections urged against it is, that it is a
sweeping prohibition of the manufacture and sale of an
article of food which is not only harmless, but wholesome,
the manufacture of which is beneficial to the people, — an
industry which should be encouraged, and not repressed.
We are disposed to concede that it is beyond the power of
the legislature to prohibit the manufacture, the cultivation,
the mining, or the importation of any known article of com-
merce, innocuous in itself, the production of which is known
to be useful to the people. We do not think it would be
competent for the legislature to prohibit the commerce in
any of the ordinary productions of agriculture, of mines,
or of manufacture, because the production of these things
is universally recognized as beneficial to the people. Such
a prohibition could not be justified on any pretence of public
safety or utility; and the common sense of mankind would
agree that an interference by the legislature with the usual
and ordinary industries by which life is supported, would
be an unjustifiable interference with private right. It
would be oppression under the pretence of a police regu-
lation.

But we do not concede that the mere fact that scientific
men may pronounce a manufactured article intended for
human food to be wholesome or harmless, renders it incom-
petent for the legislature to prohibit the manufacture and
sale of the article. Laws, in order to be wholesome, must
not only conform to the real needs of the people, but must
also respect their tastes, their prejudices, and even their
superstitions. Hence it is conceded by jurists and public-
ists, that laws which in one age or nation are wholesome
and beneficial, in another age or nation may be unwhole-

some, injurious, or oppressive. The test of the reasonableness of a police regulation prohibiting the making and vending of a particular article of food, is not alone whether it is in fact unwholesome or injurious. If an article of food is of such a character that few persons will eat it, knowing its real character; if, at the same time, it is of such a nature that it can be imposed upon the public as an article of food which is in common use, and against which there is no prejudice; and if, in addition to this, there is probable ground for believing that the only way in which to prevent the public from being defrauded into the purchasing of the counterfeit article for the genuine, is to prohibit altogether the manufacture and sale of the former, — then, we think, such a prohibition may stand as a reasonable police regulation, although the article prohibited is, in fact, innocuous, and although its production might be found beneficial to the public, if, in buying it, they could distinguish it from the production of which it is the imitation. Upon this ground rests, in part, those laws which prohibit the counterfeiting of trade-marks. A trade-mark may be a guaranty of the genuineness of an article which, through the excellence of its manufacture, or the care and skill of its manufacturer, has acquired a high reputation. A statute which punishes the counterfeiting of such a mark is founded in the double policy of protecting the owner in his proprietary interest, and of protecting the public against imposition. *The State* v. *Gibbs*, 56 Mo. 135. It would be idle to declaim against the reasonableness of such a law, on the ground that the imitator of the article in question has produced an article exactly the same as, or equally good with, the one the mark to which he has imitated. Every person has the right to buy the article which he seeks; and if he pays his money thinking he is buying this article, when he is not, is he not cheated, although he may, in fact, get an article which, but for his prejudice, would be just as good for him? The question is not what some one else may

think is for his good. He has a right to his freedom of choice; and when, through fraud, that freedom of choice is violated, is he not wronged and injured? Here is an article made from the fat of dead animals in so close an imitation of pure butter that a non-expert person cannot distinguish between them. Noticing, judicially, things which are matters of common knowledge, we know that the people will not knowingly eat this counterfeited article, and that it cannot be sold, and is not sold to those who buy butter for their personal consumption, except under the belief that it is real butter. Even though we may not know this judicially, we may, at least, indulge in so reasonable a supposition in support of the action of the legislature. The manufacturer may brand it with its real name. It may carry this brand into the hands of the broker or commission merchant, such as this defendant is; this brand may follow it into the hands of the retail grocer; but there it will be taken off, and it will be sold to the consumer as real butter, or it will not be sold at all. The fact that, in the present state of the public taste, the public judgment, or the public prejudice with respect to it, it cannot be sold, except by cheating the ultimate purchasers into the belief that it is real butter, and defrauding their judgments and their freedom of choosing what they will eat and what they will not eat, stamps with fraud the entire business of making and vending it, and furnishes a justification to a police regulation prohibiting the making and vending of it altogether.

Let us see where the argument of the learned counsel for the defendant would lead. Abundance of scientific evidence could, no doubt, be produced to show that the flesh of horses, dogs, cats, and rats is not unwholesome. But an universal popular prejudice — in some cases even a religious feeling — prohibits the eating of the flesh of such animals. If the flesh of such animals could be prepared so as not to be distinguished from the flesh of animals whose flesh is deemed wholesome, — if butchers were known in

some instances to be engaged in the business of so preparing and selling it in fraud of the judgment and choice of their customers,— would any one say that a statute prohibiting, in general terms, the selling of the flesh of horses, dogs, cats, and rats, would transcend the police power of the legislature? Upon what principle could a judicial tribunal undertake to say that a statute less sweeping in its terms would be effective to protect the public from such an imposition?

It seems to us, then, that this whole question comes to this : A practice has sprung up which operates to defraud the people of their right of choice as to what they will eat, with reference to an article of food of constant and universal consumption. The legislature has passed an act which, if properly administered, will nip the practice in the bud. The courts must uphold and administer this act as a valid exercise of the police power of the state.

4. The claim is also made, that this statute is void, as being in conflict with the provision of the constitution of the United States which vests in congress the exclusive right to regulate commerce between the states. The primary design of that provision of the federal constitution was to prevent unjust discrimination by one state against the products or manufactures of other states of the Union, or other countries. *Brown* v. *Mayland,* 12 Wheat. 419 ; *Welton* v. *The State,* 91 U. S. 275 ; *County of Mobile* v. *Kimball,* 102 U. S. 691. It has never been understood to impose any restraint upon the reasonable exercise of the police power of the states. On the contrary, as the police power of the states is a power founded in the right of self-protection, — as it appeals for its very existence to the maxim *salus populi suprema lex* (*Beer Co.* v. *Massachusetts,* 97 U. S. 33), — the power of congress to regulate commerce between the states does not in any way infringe upon its just exercise.

When, therefore, we hold that this statute is a reasonable police regulation, we necessarily hold that it does not in-

fringe this provision of the constitution of the United States. It is only those laws which, under color of police regulations or of revenue laws, prohibit or unnecessarily hamper commerce with other states or with foreign countries, that are obnoxious to the provision in question. Within this category have been placed state laws prohibiting the introduction into a state of all Mexican and Indian cattle, except during four winter months of the year, and prohibiting their shipment through the state, except during those months, unless upon conditions so onerous as to amount to a practical exclusion (*Railroad Co. v. Husen*, 95 U. S. 465) ; levying a license on the importers of foreign goods, which was not levied on those dealing in domestic goods (*Bsown* v. *The State*, 12 Wheat. 419) ; imposing a tax upon passengers arriving from foreign countries (*Passenger Cases*, 7 How. 283) ; imposing a tax upon ship-owners for each passenger landed by them (*Henderson* v. *New York*, 92 U. S. 259) ; requiring an onerous bond from the masters of such vessels, to indemnify the state against the support of such passengers as might become paupers (*Chy Lung* v. *Fullman*, 92 U. S. 275) ; imposing a more onerous burden, by way of taxation, upon the products of other states than those imposed on similar products of the particular state (*Guy* v. *Baltimore*, 100 U. S. 434) ; imposing a license tax upon non-resident traders which was not imposed upon residents of the state (*Ward* v. *Maryland*, 12 Wall. 418 ; *Tiernan* v. *Rinke*, 102 U. S. 123) ; imposing a license tax upon persons selling certain goods, not the growth, product, or manufacture of the particular state (*Welton* v. *Missouri*, 91 U. S. 275 ; *Webber* v. *Virginia*, 103 U. S. 344). But a law creating a tax, or a police regulation which bears equally upon all persons coming within its scope, whether citizens of the particular state or of other states and countries, will not be held unconstitutional on this ground. Upon this ground the supreme court of the United States has upheld a law imposing a tax upon the sale of spirituous liquors within the limits of the state

(*Henson* v. *Lott*, 8 Wall. 148) ; prohibiting the sale of such liquors altogether. *Batermeyer* v. *Iowa*, 18 Wall. 129 (affirming *s. c.* 31 Iowa, 601) ; *License Case*, 5 How. 504 ; *Beer Co.* v. *Massachusetts*, 97 U. S. 25. And the constitutionality of these laws has been almost uniformly upheld in the state courts. *The State* v. *Allmond*, 2 Houst. (Del.) 612 ; *The State* v. *Paul*, 5 R. I. 185 ; *The State* v. *Keeran*, 5 R. I. 497 ; *The People* v. *Hawley*, 3 Mich. 330 ; *The People* v. *Gallagher*, 4 Mich. 244 ; *The State* v. *Wheeler*, 25 Conn. 290 ; *Our House No. 2* v. *The State*, 4 G. Greene, 172 ; *Santo* v. *The State*, 2 Iowa, 165. Upon like grounds, it has been held by the supreme court of the United States that a person can acquire no right to manufacture and vend a noxious substance contrary to the inspection laws of the particular state, from the fact that he has received from the United States a patent granting to him the exclusive privilege to manufacture and vend the same. *Patterson* v. *Kentucky*, 97 U. S. 501.

The industry of the counsel for the defendant has not been able to refer us to any case in which a law of the state prohibiting the manufacture and sale of an article intended as human food has been declared unconstitutional, and but two cases in which any constitutional objection has been found to laws prohibiting the manufacture and sale of intoxicating liquors. *Beebe* v. *The State*, 6 Ind. 501 ; *Wynchamer* v. *The People*, 13 N. Y. 378. Against the doctrine of these two cases stands arrayed the opinion of every other court in the Union, so far as we know, where the question has been passed upon, and also that of the supreme court of the United States.

Enlightened by so many expressions of judicial opinion, nearly all of them tending in the same direction, we feel bound to hold that a statute prohibiting the manufacture and sale of an article of food made in imitation of a wholesome article in common use, which imitated article is so repugnant to the tastes and prejudices of our people that they

will not eat it when advised of its real character, but only when cheated into the belief that it is the genuine article in resemblance of which it is made, is a statute fairly within the police power of the state, not opposed to any provision of the constitution of the state or of the constitution of the United States, and the wisdom of which is not to be called in question in the judicial courts; and that this is so, although particular samples of such imitated article may, in the opinion of scientific men, be as wholesome and beneficial an article of food as the original substance in imitation of which it is made. If this defendant suffers inconvenience from the statute, it is but one of the many cases where the convenience of the individual must yield to the public good. In the language of a recent decision of the supreme court of the United States: "If the public safety or the public morals require the discontinuance of any manufacture or traffic, the hand of the legislature cannot be stayed from providing for its discontinuance, by any incidental inconvenience which individuals or corporations may suffer. All rights are held subject to the police power of the state." *Beer Co.* v. *Massachusetts*, 97 U. S. 25, 32.

The judgment of the court of Criminal Correction is accordingly affirmed. All the judges concur.