MCFADDEN ET AL. VS BLOCKER ET AL. (EVANS-SNIDER-BUELL CO., INTERVENER).

Opinion delivered January 4, 1900.

1.   *Chattel Mortgages—Recording Acts—Constitutionality.*
      Mansf. Dig. Secs. 4742-4743 (Ind. Ter. Stat. Secs. 3053, 3054) extended over and put in force in the Indian Territory by Act of Cong. May 2, 1890( 26 Stat. 81), providingfor the filing and recording of mortgages of personal property in the county wherein the mortgagor resides and making such a lien as against

third parties from the date of filing in such recorder's office, in effect requires a mortgagee to take actual possession of the mortgaged property in order to secure a lien thereon, in all cases where the mortgagor is a non-resident of the Indian Territory, while those executed by residents need only be recorded.

Such statutes are not unconstitutional and do not contravene Art. 4, Sec. 2, U. S. Const. providing that "citizens of each state shall be entitled to all the privileges and immunities of citizens in the different states," for this provision of the constitution does not affect the power of Congress to give residents of unorganized territories and indian reservations, privileges and immunities not accorded to non-residents thereof.

Neither do such statutes, which fail to provide a place for the recording of a mortgage by a non-resident, deprive him of any property or vested right, so as to come within the constitutional inhibition against a taking of property or personal liberty without due process of law.

2.  *Actual Notice Does Not Dispense with Necessity for Recording.*

Act of Cong. May 2, 1890 (26 Stat. 81) extended over and put in force in the Indian Territory Mansf. Dig. Secs. 4742, 4743 (Ind. Ter. Stat. Secs. 3053, 3054) as interpreted by the highest court of the state (Arkansas) at the time of its adoption, and the construction placed upon the statute cited by that court, to the effect that an unrecorded mortgage of personal property, without possession of the mortgaged property by the mortgagee, created no lien thereon as to third parties, whether there was actual notice or not, is controlling upon the courts in this Territory in construing the same statute.

Appeal from the United States court for the Northern District.

WILLIAM M. SPRINGER, Judge.

Action by W. P. H. McFadden and another against John R. Blocker and another. The Evans-Snyder-Buel Com-

(16)

pany intervenes. Judgment for defendants. Plaintiffs appeal. Reversed.

*Maxey Clayton & Martin, R. A. Green* and *William T. Hutchings,* for appellant.

*H. M. Pollard, Chas. B. Stuart, S. H. Cowan, S. S. Fears,* and *Matlock, Cowan & Burney,* for appellees.

CLAYTON, C. J. This case was before us and decided by this court at its last January term. We then reversed and remanded the case. The facts are fully stated in the opinion we then handed down. See 2 Ind. Ter. Rep. 260, (48 S. W. 1043.) The case now, however, presents two different phases, one of law and the other of fact. The new question of law raised is that, inasmuch as there was no provision in the recording acts of this jurisdiction whereby a mortgage executed by a nonresident mortgagor could be recorded, as could be done by a resident, and as the mortgagee, therefore, was required to take possession of the mortgaged property to secure a lien as to third persons, whereas the holder of a mortgage executed by a resident mortgagee was not, the recording acts are, therefore, unconstitutional as to the holders of such instruments. The new question of fact is that it is now shown by the proof adduced at the last trial that the attaching creditor had actual notice of the existence of the mortgage before suing out his attachment. We will consider these two new questions in the order above stated.

The law of this jurisdiction, as it stood at the time o the execution of these mortgages, and also at the time of the levying of the attachment on the mortgaged property, and of the rendition of the judgment in that suit, was as follows: "All mortgages, whether for real or personal estate, shall be proved or acknowledged in the same manner that deeds for the conveyance of real estate are now re

quired by law to be proved or acknowledged; and when so proved or acknowledged, shall be recorded—if for lands, in the county or counties in which the lands lie, and if for personal property, in the county in which the mortgagor resides.'' Section 4742, Mansf. Dig. (section 3053, Ind. T. Ann. St. 1899.) ''Every mortgage, whether for real or personal property, shall be a lien on the mortgaged property from the time the same is filed in the recorder's office for record, and not before; which filing shall be notice to all persons of the existence of such mortgage.'' Section 4743, Mansf. Dig. (section 3054, Ind T. Ann. St, 1899.) In this case the parties to the mortgage resided in Texas; the mortgaged property was in the Indian Territory, both at the time of the execution of the mortgage and the levying of the attachment; and therefore, the mortgagor being a resident of Texas, there was no place provided by the statute where the mortgage could be recorded. The mortgaged property was left in the possession of the mortgagor. It is argued that this is such a discrimination between residents of the Indian Territory and nonresidents as to render the statute unconstitutional, as being in violation of the first clause of section 2, art. 4. of the constitution of the United States. By act of congress of May 2, 1890 (Ind. T. Ann. St. 1899, §§ 29—44), certain statutes of the state of Arkansas were extended over this territory, among them the one we are now considering. At that time the supreme court of Arkansas, in the case of Watson vs Lumber Co.. 49 Ark. 83, 4 S. W. 62, passing on this very statute, had held that a mortgage executed by a nonresident of the state could not, by a recordation of the mortgage in Arkansas, create a lien as against strangers to the instrument, although they may have had actual notice of its existence; that, as to mortgages executed by nonresidents, a lien could only be created as against strangers by the mortgagee taking possession of the mortgaged prop-

<span>Recording acts. Constitutionality</span>

erty.   This statute has been the law of Arkansas for a long period of time, and its constitutionality has never been successfully assailed, and it came to us with an interpretation of the highest court of the state from whence it came fastened upon it.   It is conceded that, if the statute is unconstitutional, the decision of the supreme court of Arkansas treating it as a constitutional one does not make it so, and in such a case that decision would not be binding upon us, as in other cases.   But the fact that for many years the learned bar and the courts of that state, and many others having similar statutes, have failed to discover its unconstitutionality, and have constantly and persistently enforced it, is persuasive, at least, of its legality; and, if it is so palpably unconstitutional as is now so earnestly claimed by learned counsel for appellees, how came it that at the last trial, when it was here before, the contention was not made, or even hinted at, to us?   If so plain and certain now, how is it that it had not long since suggested itself to their legal minds?   Why has it lain dormant during the whole period of a long trial, both in the court below and here?   The suggestion of this offspring of an afterthought probably had its origin in a somewhat inaccurate and loose expression found in the original opinion of this court in the case when it was said that the holders of such a mortgage "belonged to a prescribed class " Both in oral and written argument of counsel, as well as the opinion of the eminent jurist who tried this case below,—which opinion is made an appendix to the transcript filed in this court,—this expression is laid hold of, and is made the foundation of the claim of the unconstitutionality of the statute.   The writer of that opinion disclaims the credit, attempted to be forced upon him, of having discovered this constitutional defect.

The clause of the constitution of the United States referred to reads as follows:   "The citizens of each state shall be entitled to all privileges and immunities of citizens

in the different states." Section 2, art. 4, Const. U. S. This was intended to secure to the citizens of every state within every other the privileges and immunities (whatever they might be) accorded in each to its own citizens. Lemmon vs People, 20 N. Y. 627. It is a limitation upon the powers of the states and in no wise effects the powers of congress over the unorganized territories and Indian reservations. It is doubtlessly true that the citizens of all the states must be accorded equal privileges and immunities within those territorie s and reservations but it does not necessarily follow that they are to have the same privileges and immunities as those residing here. There are no such limitations upon the power of congress anywhere expressed in the constitution. The inhabitants of a state have a dual citizenship, —state and federal. The article of the constitution under consideration guaranteed to the "citizens of each state" all privileges and immunities of citizens in the several states. But this interstate citizenship is only granted to citizens of a state, not to citizens of the United States. There is no citizenship of this territory, and the only citizenship its inhabitants and residents have, or congress can confer, is national. Prentiss vs Brennan, Fed. Cas. No. 11,385; U. S. vs Cruikshank, 92 U. S. 542, 23 L. Ed. 588; Picquet vs Swan, Fed. Cas. No. 11,134. It is plain, therefore, that unless a law deprives the inhabitants of a territory of some property or vested right, or of personal liberty, without due process of law, congress has plenary power of legislation over them. And more especially is this true of this territory, which is unorganized, and composed entirely of Indian reservations. Whart. Am. Law, § 461; Suth. St. Const. § 23; Thompson vs Utah, 170 U. S. 349, 18 Sup. Ct. 620, 42 L. Ed. 1061; Cole vs Cunningham, 133 U. S. 107, 10 Sup. Ct. 269, 33 L. Ed. 538. It is unnecessary to point out that the right of a nonresident to have a place in which he may record a mortgage is not property, or a vested right, and to

*Residents of Indian Territory Citizenship.*

deprive him of such a privilege is not to deprive him of his property or personal liberty without due process of law; and, if it be conceded that such a statute would be unconstitutional in one of the states, it is not so in this territory.

But would such a statute as we are now considering be repugnant to this constitutional provision if it were enacted by the legislature of a state? As before stated, many of the states have such statutes, and they have always been upheld by their courts; and in every instance where a change was desired, so that nonresidents might be enabled to record in the county where the mortgaged property was located, it has been found necessary to resort to legislative enactment. Since this statute was, by act of congress, extended over this territory, Arkansas, from whence it came, has enacted a law permitting mortgages executed by nonresidents to be recorded in the county where the mortgaged property was situated, and recently the United States Congress, recognizing, inferentially at least, its validity, has passed a similar act, approved February 3, 1897 (Ind. T. Ann. St. 1899, § 3074a). In the case of Watson vs Lumber Co., supra, the supreme court of Arkansas, passing on this statute, held it valid. The statute of Michigan formerly was the same in this respect as ours. In the case of Montgomery vs Wight, 8 Mich. 148, the supreme court of that state, in holding the statute valid, say: "If a chattel mortgage of property here is made by a nonresident, our law contains no provision for filing it. In such a case a change of possession is, therefore, essential, and cannot be dispensed with against creditors or purchasers." And the mortgage executed by a nonresident was held invalid as against a levy and sale made under an execution. In New Hampshire the statute makes no provision for recording a mortgage executed by a nonresident mortgagor. In the case of Smith vs Moore, 11 N. H. 55, the supreme court say: "As between the parties, the mortgage is good. * * * But by the statute of 1832 it was of no

validity against the creditors of the mortgagor, unless possession was taken under it.    By the provisions of that act no mortgage of personal property subsequently made is valid against any other persons than the parties to it, unless possession of the property be delivered to and retained by the mortgagee, or unless the mortgage be recorded in the office of the clerk of the town where the mortgagor resides at the time of its execution.    The mortgage could not be made valid by any record of it, because the mortgagor did not reside in this state at the time; and the town clerk's office, provided for by the statute, is a record within this state, and not within another government.    *   *   *   To protect the property against creditors, where the mortgagor resides out of the state, the mortgagee must take and retain possession." See, also, Granger vs Adams, 90 Ind. 87. The text writers are in accord with these decisions. Jones, Chat. Mortg. (4th Ed.) § 261, says: "In case the mortgagor resides out of the state, under a statute which provides for the recording of a mortgage at the mortgagor's place of residence, and does not provide for recording it in the place where the mortgaged property is situated, there can be no effectual record of the mortgage, and therefore the only effectual mode of making the mortgage is for the mortgagee to take and hold actual possession of the property." 2 Cobbey, Chat. Mortg. § 578, says: "When the mortgagor resides out of the state, and the only provision for the recording of the mortgage is that it shall be recorded in the county or town of the residence of the mortgagor, the mortgagee must take and hold possession of the mortgaged property as if there were no law for the mortgaging of chattels." The registry acts were "enacted to modify the rule of the common law, which made every chattel mortgage of articles capable of manual delivery, unaccompanied with change of possession of the things mortgaged, prima facie void as to creditors of and bona fide purchasers from the mortgagor;

to give security to mortgagees by making their mortgages unaccompanied with possession of the property valid when recorded, and by the same record to protect creditors and purchasers against secret trusts.'' Pyeatt vs Powell, 10 U. S. App. 206, 2 C. C. A. 370, 51 Fed. 554. And the court of appeals for the Eighth circuit, in the same case say: ''The registry acts * * * are in the nature of a police regulation of a state.'' It is argued that because the effect of this statute is to prohibit a nonresident from entering into a contract whereby he may place a mortgage upon his chattels, and at the same time hold possession of them, it is unconstitutional, as prohibiting the right to contract in relation to one's personal property. But it must be remembered that when a contract is subversive of the public interest, or against public morals, or affects the public welfare, the legislature may control the manner in which the contract shall be executed, and, to some extent, at least in such cases, control the right to contract at all. ''The right to contract is not unlimited. The conflicting interests of individuals make this impossible. Rights in conflict with each other cannot be unlimited. Duties to persons, to society, the public, and the government are imposed on every individual. Every man, when he enters into society, undertakes to perform these duties, and necessarily surrenders some rights or privileges on account of his relations to others. His right to contract becomes subject to these duties, among which is the duty to so conduct himself and use his own property as not to unnecessarily injure another. He submits himself to such restraints and burdens as may conduce to the general comfort, health, and prosperity of the state. To conserve and enforce these rights and duties, the government can impose such restrictions upon his actions as may be appropriate for that purpose. 'This power inheres in every sovereignty, and is essential to the maintenance of public order and the preservation of mutual rights from the disturbing conflicts

which would arise in the absence of any controlling regulating authority.'" Leep vs Railway Co., 58 Ark. 415, 25 S. W. 75, 23 L. R. A. 264; Budd vs New York, 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247. And it is not necssary that the contract thus brought within the control of the legislature shall be a public one, or relate to public matters in which the government or the people collectively shall have property rights. It is sufficient if it relate to a matter in which the public are interested. A contract for interest on borrowed money between two individuals is purely personal and private, and yet all will now agree that the usury laws are constitutional; and yet by these laws a contract for a larger rate of interest than that prescribed by the statute renders such a contract void as to such excess of interest, or the whole interest, or as to the entire contract, according to the language of the statute. In Budd vs New York, supra, the Supreme Court of the United States held that the legislature had the power to fix the maximum rate to be charged by the owner of a private elevator. It has frequently been held that the legislature can regulate or prohibit the sale or manufacture of oleomargarine, for the purpose of protecting the public against fraud. Powell vs Pennsylvania, 127 U. S. 678, 8 Sup. Ct. 992, 1257, 32 L. Ed. 253; Id. 114 Pa. St. 265, 7 Atl. 913; State vs Addington, 12 Mo. App. 214; Id., 77 Mo. 110. The same powers are exercised in the enactment of our statutes of fraud, which render certain contracts void unless in writing, although such contracts are private and personal. And one of the principal reasons, if not the controlling one, in the enactment of our registry laws, is to prevent secret trusts to be fraudulently used; not as against the parties to the instrument, but as against the people generally. It is a matter in which every one who buys and sells goods and chattels has an interest. And therefore the subject is within the constitutional powers of the legislature, and, although a matter of private contract,

may be regulated by the legislature, even to declaring such contracts void; and, although such legislation may be unwise, and work hardships, "yet the courts cannot interfere without usurping powers committed to another department of the government. The appeal must be to the legislature or to the ballot box, not to the judiciary." Powell vs Pennsylvania, 127 U. S. 678, 8 Sup. Ct. 992, 1257, 32 L. Ed. 253. And it matters not whether the legislation be by virtue of the police powers of the state or by virtue of the powers in the nature of the police powei. The reasoning in both cases would be the same. In the above-cited case of Powell vs Pennsylvania the Supreme Court of the United States say: "Whether the manufacture of oleomargarine, or imitation butter, of the kind described in the statute, is or may be conducted in such a way or with such skill or secrecy as to baffle ordinary inspection, or whether it involves such dangers to the public health as to require, for the protection of the people, the entire suppression of the business, rather than its regulation in such manner as to permit the manufacture and sale of articles of that class that do not contain noxious ingredients, are questions of fact and public policy which belong to the legislative department to determine; and as it does not appear upon the face of.the statute, or from any fact of which the courts must take judicial cognizance, that it infringes rights secured by fundamental law, the legislative determination of those questions is conclusive on the courts. It is not a part of their function to conduct investigations of fact entering into questions of public policy merely, and to sustain or frustrate the legislative will, embodied in a statute, as they may happen to approve or disapprove its determination of such question. The power which the legislature has to promote the general welfare is very great, and the discretion which that department of the government has in the employment of means to that end is very large." And to the same effect are Plumley vs Massachusetts, 155

U. S. 461, 15 Sup. Ct. 154, 39 L. Ed. 223; Mugler vs Kansas, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205; Leisy vs Hardin, 135 U. S. 100, 10 Sup. Ct. 681, 34 L. Ed. 128.   Does it "appear on the face of this statute, or from facts of which the court must take judicial cognizance," that it "infringes on rights secured by the fundamental law"?    The statute was intended to secure the people from frauds arising from secret trusts, and, as this affected the interest of the people, the legislature had full and ample power to pass it, and this power reached the nonresident as well as the resident.  But, if nonresidents who execute this class of instruments in the state are not to be affected by the act, but are to be left in the·same attitude in which they were before, then the legislature has but half performed its duty, and the enforcement of the law depends upon the fact as to who executed the instrument.   If the instrument should be executed by a resident, the people would be protected; if by a nonresident, not; and as to all such instruments executed by them the same evils would continue to exist.   But it is said the legislature could have granted full relief by requiring the mortgage executed by a nonresident to be recorded in the county in which the property was situated, instead of requiring the mortagee to take possession of the property. And it is true the legislatnre could have done this.   But if, in its judgment, it were deemed that the public interest would be best subserved by adopting the one course rather than the other, is not its judgment final?   Can the courts control it in a matter of judgment as between two remedies? Certainly not.   From the very circumstances of the case in this particular, the legislature was powerless to place residents and nonresidents upon the same footing, and no one will doubt but that, if legislation were necessary at all, it was necessary in the one case as well as in the other; that the evils resulting from the use of unrecorded mortgages with possession of the property in the hands of the

mortgagor were as great, and demanded a remedy to the full extent, when executed by a nonresident, as by a resident. If, then, the legislature, in its wisdom, and exercising its best judgment, concluded that as to nonresident mortgagors, who from the fact that they did not live in the state, could not record their mortgages in a county of their residence in the state, should be required to turn over the possession of the mortgaged property to the mortgagee, instead of requiring such mortgages to be recorded in the county where the property was situated, it had the power to do so. This is what the common law required to be done, and, if not done, the mortgage as to third person was prima facie fraudulent and void. The statute only makes conclusive that which was before prima facie. The right to execute a mortgage so as to create a lien as to third parties is not interferred with, except that the manner in which it shall be done is regulated by statute. The fact that the mode prescribed for the nonresident may be more inconvenient than that prescribed for the resident is not because the statute intends to make a discrimination, but because of the situation of the parties, and because, in the judgment of the lawmaking power, no other as effective way could be adopted for the protection of the public.

The next contention is that, inasmuch as it was conceded at the last trial below that the attaching creditor had actual notice of the existence of the mortgages, no record of them was necessary as to him; that, as far as he was concerned, actual notice validated the mortgages. If it be true that the statutes of Arkansas, contained in Mansfield's Digest, as they had been construed by the supreme court of that state prior to the time they were extended over this jurisdiction, are binding upon us, then this contention cannot be maintained, for that state has held in many decisions, and without an exception, that an unrecorded mortgage, with possession of the mortgaged property in the mort-

Actual Notice

gagor, created no lien as to third parties, whether there was actual notice or not; and this was decided, and authorities cited, when the case was last before us. In Cross vs Fombey, 54 Ark. 178, 15 S. W. 463, the supreme court of Arkansas say: "We have no hesitation in saying that under the statute of this state an order of attachment becomes a lien upon the property of the defendant, subject to seizure on execution for the debts of the defendant in the county, from the time the order comes to the hands of the officers; and that by levy of the attachment and judgment sustaining the same such inchoate lien is perfected, and takes precedence of the lien of a mortgage executed before the order of attachment came to the hands of the officer, but not recorded till afterward. * * * Though good between the parties, until filed for record under the statute the lien of the mortgage as to third parties has no existence, and is not binding upon them, though they have actual notice of it." In the case of Dodd vs Parker, 40 Ark. 536; the same court say: "Our statute of mortgages is peculiar. It provides that every mortgage shall be a lien on the mortgaged property from the time it is filed for record, and not before, which filing shall be notice to all persons of the existence of a mortgage. And it cannot be legally filed for record until it has been properly acknowledged. Hence it has been uniformly held in this state that an unregistered mortgage, or one which has been improperly admitted to registration, constitutes no lien upon the mortgage property as against a stranger, notwithstanding he may have actual knowledge of its existence." In Jacoway vs Gault, 20 Ark. 190, the court say: "A mortgage not acknowledged or proven and recorded as required by the statute, though good as between the parties to it, is not valid as against subsequent purchasers or incumbrancers of the mortgaged premises, though they have actual notice of the existence of the mortgage." In Watson vs Lumber Co., supra,—a

case identical with this in all of its features,—the supreme court of Arkansas say: "It has been repeatedly held by this court that a mortgage is good between the parties thereto, though not acknowledged and recorded, but constitutes no lien upon the mortgaged property as against strangers, unless it is acknowledged and recorded, even though they may have actual notice of its existence;" and then proceeds to decide the principal question in this case,— that a nonresident can execute no mortgage without turning over the possession of the mortgaged property to the mortgagee, which will create a lien as against strangers to the instrument. So, also, Main vs Alexander, 9 Ark. 112; Hannah vs Carrington, 18 Ark. 105; Haskill vs Sevier. 25 Ark. 158. While it is true that there may be certain conditions existing whereby this court would not be bound by the previous adjudications of the supreme court of Arkansas upon a statute of that state extended by act of congress over this territory, yet this case presents no such conditions. It has been repeatedly decided by this court, as well as by the court of appeals for the Eighth circuit and the supreme court of the United States, that a statute of a state extended over another jurisdiction is to be enforced in the latter jurisdiction as interpreted by the highest court of the state from whence it came. Sanger vs Flow, 1 C. C. A. 56, 48 Fed, 152; Stutsman Co. vs Wallace, 142 U. S. 295, 12 Sup. Ct. 227, 35 L. Ed. 1018. The act of congress of May 2, 1890, extending these statutes over the Indian Territory, reads as follows: "That certain general laws of the state of Arkansas, in force at the close of the session of the general assembly of that state of eighteen hundred and eighty three, as published in eighteen hundred and eighty four, in the volume known as Mansfield's Digest of the Statutes of Arkansas, etc., are hereby extended over and put in force in the Indian Territory." Act Cong. May 2, 1890, § 31 (Ind. T. Ann. St. 1899, § 31). It is the "general laws in force in

the state of Arkansas" at that time which were extended. And the general laws of that state in force then were the statutes, not as they might be hereafter construed, but as they were then construed, by the highest court of Arkansas. In other words, the decided laws were the general ·laws of the state then in force, and it was the general laws then in force that were extended; and therefore the interpretation of the supreme court of Arkansas, had prior to the extension of the statute over this territory, to the effect that an unrecorded mortgage created no lien as to strangers to the instrument, although they may have had actual notice of its existence, is, as we have before said, the statutory law of this jurisdiction. And, if this were a new question, undecided by any court, from what we conceive to be a correct interpretation of the statute, we would be compelled to hold as the supreme court of Arkansas has held, and range ourselves with those states which hold that actual notice of the existence of an unrecorded mortgage creates no lien as to strangers. The language of the statute is: "Every mortgage, whether for real or personal property, shall be a lien on the mortgaged property from the time the same is filed for record and not before." Mansf. Dig. § 4743 (Ind. T. Ann. St. 1899, § 3054). If not to become a lien until filed for record,—if before that time it is not to be a lien at all,—how can actual notice of the existence of a mortgage not filed for record make it a lien on the property? Such a construction would be construing away the very language of the statute. In the case of Main vs Alexander, supra, decided by the supreme court of Arkansas in 1848, it was contended that the language of the act forbade a lien even as between the parties to the mortgage, but that court very properly held that, as the recording acts were intended to give notice to strangers of an existing lien as between the parties, they could not have that effect as to them, and the court then say: "The rights of the parties to a mortgage,

whether acknowledged and recorded or not, are precisely the same that they were before the passage of the act referred to, and the only real difference consists in the fact that, although actual notice may be shown, it will constitute no answer to the demands of strangers, and that nothing short of an actual filing for record will be recognized as such a notice as to affect his rights." In this case therefore, we are compelled to hold that the fact that the attaching creditor had actual notice of the existence of these unrecorded mortgages put him in no different condition than if he had had no such notice, unless it can be shown that the mortgages may be considered as at common law.

It is contended that, inasmuch as our recording acts made no provision for recording a mortgage executed by a nonresident mortgagor, such mortgages are not affected by it, and, as the legal effect of all mortgages executed prior to the enactment of the statute in this jurisdiction was determined by the rules of the common law, so should these mortgages be; and to sustain this contention counsel rely on the case of Pyeatt vs Powell, 10 U. S. App. 200, 2 C. C. A. 367, 51 Fed. 551. But in that case the mortgage was executed and an execution levied upon the mortgaged property before the act of congress extending the Arkansas recording acts over the Indian Territory was passed. At that time we were without any statute upon the subject. The mortgagor resided, and the mortgaged property was situated, in the Indian Territory. The court held that, while the common law may not prevail in the Indian Territory, yet in the federal courts, in the absence of statutes repealing or modifying it, the common law is the rule of decision and guide of action, and therefore, as there was no statutory law here relating to mortgages, nothing requiring them to be recorded, or changing the rule of the common law, and the action having been brought in a federal court, and it having been shown that the mortgage

had been executed and the possession of the property re-
tained by the mortgagor in good faith, the court held that
under these circumstances the common-law rule must pre-
vail, and formulated the rule as follows: ''The rule of the
common law is that a mortgage of personal property, unac-
companied with possession, is prima facie void as to cred-
itors of the mortgagor; yet the presumption of fraud arising
from that circumstance may be rebutted by explanations
showing the transaction to be fair and honest, and giving a
reasonable account of the retention of possession.'' But
this rule, however, was applied in the case solely because
the action was pending in a federal court, and there was
no statute changing the common law as a rule of decis-
ion for that court. But there has since been an
act of congress, extending over this territory, among
many others, the recording statutes of the state of
Arkansas, and thereby changing the rule of decision in this
particular from the common law to the statutory law as it
existed in Arkansas in 1883, and this law was in force here
at the time the mortgages in this case were executed and
the writ of attachment levied upon the property. By the
act of congress, the whole system relating to the recorda-
tion of mortgages, and to their liens, and to the effect of
such recordation, in the state of Arkansas, as they had ex-
isted there for many years, was extended over the Indian
Territory. The whole subject was embraced by the act,
bringing it strictly within the rule, ''Expressio unius est ex-
clusio alterius.'' If the statute provided no place for record-
ing a mortgage executed by a nonresident mortgagor, it in-
tended it. If, in the wisdom of the legislature, it was
thought best that in such case the mortgagee should be re-
quired to take possession of the mortgaged property rather
than to allow him to record it at the place where the mort-
gaged property should be situated, it had the power to do
so; and the reason for such action as to personal property

(17)

is apparent. To-day the nonresident owner of chattels, a man who may be in to-day and out to-morrow, may place a mortgage upon them, and record it in the county where situated; in a week hence he may have them in a county a hundred miles away, and, keeping secret the fact that he had executed a mortgage upon them, and had it recorded in one of the counties through which he had passed, he may deal with them as his own, and convey or otherwise dispose of them as his own, and thus defeat the very object of the recording acts The very difficulty of locating the place of record in such cases would render the statute almost a nullity. Certainly the legislature never intended that any mortgages executed in the state should be left subject to the same abuses and liable to the same fraudulent uses as they were before the act. If, however, the contention of learned counsel for appellee be correct that all mortgages executed by nonresidents of the state are to be considered and treated as at common law, then as to them all of the evils intended to be corrected still exist, and nonresident mortgagors are given the advantage over residents to the extent that they may, by the use of such instruments, continue the creation of secret trusts and such other fraudulent acts as the statute intended to remedy. Besides, we would be placed in the remarkable condition of having two rules of decision for our courts,—the statutory rule for resident and the common-law rules for nonresident mortgagors. Before the passage of the statute, all mortgages in Arkansas were at the common law, and it was the evils attendant upon the use of the common-law mortgage that the act intended to remedy, and it would be absurd to claim that the legislature intended to correct the evil when the mortgage should be executed by one class of people and not when executed by another. In our opinion, it was intended by the act that in the execution of a mortgage by a nonresident mortgagor upon property in the state, so as to create a lien as to third parties, actual

delivery of possession to the mortgagee and retention of possession by him must be had; and, if intended, it is the command of the legislature, and must become our statutory rule of decision. If this be not true, then all of the states which have been enforcing this statute in accordance with the view here expressed are at fault, for the same objection made here would hold good as to any of the states having the same statute. We therefore hold that the effect of the statute was to require all mortgages executed by nonresidents of this territory, before they could become liens as to third parties, to be accompanied by possession of the mortgaged property by the mortgagee, and that such legislation was constitutional. And we further hold that a mortgage not filed for record created no lien as to strangers, although they may have actual notice of its existence. The judgment of the United States court for the Northern district is therefore reversed, and, at the request of counsel for all the parties, made here in open court, judgment is here rendered for the appellants, saving to the appellees all of their rights of appeal to the United States circuit court of apppeals for the Eighth circuit